DAVIS ET AL. *v.* BANDEMER ET AL.

No. 84–1244.   Argued October 7, 1985—Decided June 30, 1986

WHITE, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Part II, in which BRENNAN, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined, and an opinion with respect to Parts I, III, and IV, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined. BURGER, C. J., filed an opinion concurring in the judgment, *post*, p. 143. O'CONNOR, J., filed an opinion concurring in the judgment, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 144. POWELL, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, J., joined, *post*, p. 161.

*William M. Evans* argued the cause for appellants. With him on the briefs were *Linley E. Pearson*, Attorney General of Indiana, *Michael T. Schaefer*, Deputy Attorney General, and *Alan W. Becker*.

*Theodore R. Boehm* argued the cause for appellees. With him on the briefs for appellees Bandemer et al. was *John B. Swarbrick, Jr. Grover T. Hawkins* filed a brief for appellees Indiana NAACP State Conference of Branches.*

*Briefs of *amici curiae* urging reversal were filed for the Assembly of the State of California by *Joseph Remcho* and *Charles C. Marson;* for the Mexican American Legal Defense and Educational Fund by *Jose Garza, Antonia Hernandez*, and *John E. Huerta;* and for the Senate of the State of California by *Allan Browne.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Arthur N. Eisenberg, Burt Neuborne, Charles S. Sims*, and *Lawrence M. Reuben;* for Common Cause by *Philip Heymann;* and for the Republican National Committee by *Roger Allan Moore, E. Mark Braden, Michael A. Hess, James R. Parrinello*, and *Marguerite Mary Leoni.*

*Richard C. Borow, Jonathan H. Steinberg*, and *Daniel Hays Lowenstein* filed a brief for the California Democratic Congressional Delegation as *amicus curiae.*

JUSTICE WHITE announced the judgment of the Court and delivered the opinion of the Court as to Part II and an opinion as to Parts I, III, and IV, in which JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join.

In this case, we review a judgment from a three-judge District Court, which sustained an equal protection challenge to Indiana's 1981 state apportionment on the basis that the law unconstitutionally diluted the votes of Indiana Democrats. 603 F. Supp. 1479 (SD Ind. 1984). Although we find such political gerrymandering to be justiciable, we conclude that the District Court applied an insufficiently demanding standard in finding unconstitutional vote dilution. Consequently, we reverse.

I

The Indiana Legislature, also known as the "General Assembly," consists of a House of Representatives and a Senate. There are 100 members of the House of Representatives, and 50 members of the Senate. The members of the House serve 2-year terms, with elections held for all seats every two years. The members of the Senate serve 4-year terms, and Senate elections are staggered so that half of the seats are up for election every two years. The members of both Houses are elected from legislative districts; but, while all Senate members are elected from single-member districts, House members are elected from a mixture of single-member and multimember districts. The division of the State into districts is accomplished by legislative enactment, which is signed by the Governor into law. Reapportionment is required every 10 years and is based on the federal decennial census. There is no prohibition against more frequent reapportionments.

In early 1981, the General Assembly initiated the process of reapportioning the State's legislative districts pursuant to the 1980 census. At this time, there were Republican majorities in both the House and the Senate, and the Governor

was Republican.[1]  Bills were introduced in both Houses, and a reapportionment plan was duly passed and approved by the Governor.[2]  This plan provided 50 single-member districts for the Senate; for the House, it provided 7 triple-member, 9 double-member, and 61 single-member districts.  In the Senate plan, the population deviation between districts was 1.15%; in the House plan, the deviation was 1.05%.  The multimember districts generally included the more metropolitan areas of the State, although not every metropolitan area was in a multimember district.  Marion County, which includes Indianapolis, was combined with portions of its neighboring counties to form five triple-member districts.  Fort Wayne was divided into two parts, and each part was combined with portions of the surrounding county or counties to make two triple-member districts.  On the other hand, South Bend was divided and put partly into a double-member district and partly into a single-member district (each part

---

[1] Politically speaking, the State of Indiana is a "swing" State: It has supported both the Democrats and the Republicans at various times, often following national trends and major candidates.  Although at times within the last few decades the State has voted up to 56% Democratic, in 1980 the Republicans took the State.

[2] These bills were "vehicle bills"—bills that had no real content.  Both bills were passed and were then referred to the other House and eventually to a Conference Committee, which consisted entirely of Republican members.  Four Democratic "advisers" to the Committee were appointed, but they had no voting powers.  Further, they were excluded from the substantive work of the Committee: The Republican State Committee funded a computerized study by an outside firm that produced the districting map that was eventually used, and the Democratic "advisers" were not allowed access to the computer or to the results of the study.  They nevertheless attempted to develop apportionment proposals of their own using the 1980 census data.  A few days before the end of the 1981 legislative session, the Conference Committee presented its plan to the legislature.  The Democratic minority also presented its alternative plan.  The majority plan was passed in both Houses with voting along party lines and was signed into law by the Governor.

combined with part of the surrounding county or counties). Although county and city lines were not consistently followed, township lines generally were. The two plans, the Senate and the House, were not nested; that is, each Senate district was not divided exactly into two House districts. There appears to have been little relation between the lines drawn in the two plans.

In early 1982, this suit was filed by several Indiana Democrats (here the appellees) against various state officials (here the appellants), alleging that the 1981 reapportionment plans constituted a political gerrymander intended to disadvantage Democrats. Specifically, they contended that the particular district lines that were drawn and the mix of single-member and multimember districts were intended to and did violate their right, as Democrats, to equal protection under the Fourteenth Amendment. A three-judge District Court was convened to hear these claims.

In November 1982, before the case went to trial, elections were held under the new districting plan. All of the House seats and half of the Senate seats were up for election. Over all the House races statewide, Democratic candidates received 51.9% of the vote. Only 43 Democrats, however, were elected to the House. Over all the Senate races statewide, Democratic candidates received 53.1% of the vote. Thirteen (of twenty-five) Democrats were elected. In Marion and Allen Counties, both divided into multimember House districts, Democratic candidates drew 46.6% of the vote, but only 3 of the 21 House seats were filled by Democrats.

On December 13, 1984, a divided District Court issued a decision declaring the reapportionment to be unconstitutional, enjoining the appellants from holding elections pursuant to the 1981 redistricting, ordering the General Assembly to prepare a new plan, and retaining jurisdiction over the case. See 603 F. Supp. 1479.

To the District Court majority, the results of the 1982 elections seemed "to support an argument that there is a built-in bias favoring the majority party, the Republicans, which instituted the reapportionment plan." *Id.*, at 1486. Although the court thought that these figures were unreliable predictors of future elections, it concluded that they warranted further examination of the circumstances surrounding the passage of the reapportionment statute. See *ibid.*[3] In the course of this further examination, the court noted the irregular shape of some district lines, the peculiar mix of single-member and multimember districts,[4] and the failure of the district lines to adhere consistently to political subdivision boundaries to define communities of interest. The court also found inadequate the other explanations given for the configuration of the districts, such as adherence to the one person, one vote imperative and the Voting Rights Act's no retrogression requirement. These factors, concluded the court, evidenced an intentional effort to favor Republican incumbents and candidates and to disadvantage Democratic voters.[5] This was achieved by "stacking" Democrats into

---

[3] A multitude of conflicting statistical evidence was also introduced at the trial. The District Court, however, specifically declined to credit any of this evidence, noting that it did not "wish to choose which statistician is more credible or less credible." 603 F. Supp., at 1485.

[4] The court noted that various House districts combined urban and suburban or rural voters with dissimilar interests and that many of the districts were unwieldy shapes. Using Marion County as one example, the court observed that the county itself had exactly the population to support 14 House seats; nevertheless, it was combined with various surrounding areas to form five triple-member districts, which maintained the county's prior 15-member delegation even though it had in fact suffered a population decrease. Believing that the resulting multimember districts were suspect in terms of compactness, the court concluded that no rational reason could support them.

[5] In addition, the court quoted from the deposition testimony of the Speaker of the House as follows:

"MR. SUSSMAN: What I would like you to do here again is to give me whatever reasons were operative to your mind in maintaining or creating

districts with large Democratic majorities and "splitting" them in other districts so as to give Republicans safe but not excessive majorities in those districts.[6]  Because the 1982 elections indicated that the plan also had a discriminatory effect in that the proportionate voting influence of Democratic voters had been adversely affected and because any scheme "which purposely inhibit[s] or prevent[s] proportional representation cannot be tolerated," *id.*, at 1492, the District Court invalidated the statute.[7]

---

multi-member districts with regard to (Districts) 48 through 52 [the Marion County districts].

"MR. DAILEY: Political.

"MR. SUSSMAN: What were the political factors?

"MR. DAILEY: We wanted to save as many incumbent Republicans as possible." *Id.*, at 1484.

The court also quoted from the deposition testimony of Senator Bosma as follows:

"MR. SUSSMAN: This (newspaper) article says further, 'Under further questioning from Townsend about input in actual map drawing, Bosma said "You will have the privilege to offer a minority map.   But I will advise you in advance that it will not be accepted."'  Is that accurate?

"MR. BOSMA: That's accurate.   I might add that I don't make goals for the opposite team." *Ibid.*

[6] These are familiar techniques of political gerrymandering.   Democratic (or Republican, as the case may be) votes are "stacked" and "wasted" by creating districts where Democrats form majorities much greater than the 50% necessary to carry those districts.   Concurrently, Republican votes are spread among districts in which they form safe, perhaps 55%, majorities, and Democratic votes are "cracked" or "split" by dispersing them in such a way as to be ineffectual.

[7] Judge Pell, writing in dissent, disagreed.   Assuming for the purposes of his analysis that a political gerrymandering case was justiciable, he concluded that the appellees had not proved discrimination.   Rather, once the relative voting strengths were properly ascertained, it was his view that the plan had advantaged and disadvantaged both parties equally: The Democrats won more than their voting strength in the Senate and less in the House.   See *id.*, at 1501–1502.   Judge Pell also rejected the majority's analysis of the multimember districts and thought that the State had followed rational nondiscriminatory criteria in formulating the 1981 plan.

The defendants appealed, seeking review of the District Court's rulings that the case was justiciable and that, if justiciable, an equal protection violation had occurred.[8] We noted probable jurisdiction. 470 U. S. 1083 (1985).

## II

We address first the question whether this case presents a justiciable controversy or a nonjusticiable political question. Although the District Court never explicitly stated that the case was justiciable, its holding clearly rests on such a finding. The appellees urge that this Court has in the past acknowledged and acted upon the justiciability of purely political gerrymandering claims. The appellants contend that we have affirmed on the merits decisions of lower courts finding such claims to be nonjusticiable.

## A

Since *Baker* v. *Carr*, 369 U. S. 186 (1962), we have consistently adjudicated equal protection claims in the legislative districting context regarding inequalities in population between districts. In the course of these cases, we have developed and enforced the "one person, one vote" principle. See, *e. g.*, *Reynolds* v. *Sims*, 377 U. S. 533 (1964).

---

[8] Consolidated with this suit in the proceedings below was another lawsuit, filed by the Indiana NAACP. The NAACP suit challenged the plans as unconstitutional dilutions of the black vote in Indiana in violation of the Fourteenth and Fifteenth Amendments and the Voting Rights Act of 1965, 42 U. S. C. § 1973 (as amended).

In rejecting the NAACP claims, the District Court majority found: "[T]he voting efficacy of the NAACP plaintiffs was impinged upon because of their politics and not because of their race. It is not in dispute that blacks in this state vote overwhelmingly Democratic." 603 F. Supp., at 1489–1490. Consequently, the majority found no Fifteenth Amendment or Voting Rights Act violation. The dissent concurred with this result but gave different reasons for reaching this conclusion.

The NAACP did not appeal these dispositions. Consequently, the only claims now before us are the political gerrymandering claims.

Our past decisions also make clear that even where there is no population deviation among the districts, racial gerrymandering presents a justiciable equal protection claim. In the multimember district context, we have reviewed, and on occasion rejected, districting plans that unconstitutionally diminished the effectiveness of the votes of racial minorities. See *Rogers* v. *Lodge*, 458 U. S. 613 (1982); *Mobile* v. *Bolden*, 446 U. S. 55 (1980); *White* v. *Regester*, 412 U. S. 755 (1973); *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971); *Burns* v. *Richardson*, 384 U. S. 73 (1966); *Fortson* v. *Dorsey*, 379 U. S. 433 (1965). We have also adjudicated claims that the configuration of single-member districts violated equal protection with respect to racial and ethnic minorities, although we have never struck down an apportionment plan because of such a claim. See *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 430 U. S. 144 (1977); *Wright* v. *Rockefeller*, 376 U. S. 52 (1964).

In the multimember district cases, we have also repeatedly stated that districting that would "operate to minimize or cancel out the voting strength of racial *or political* elements of the voting population" would raise a constitutional question. *Fortson, supra,* at 439 (emphasis added). See also *Gaffney* v. *Cummings*, 412 U. S. 735, 751 (1973); *Whitcomb* v. *Chavis, supra,* at 143; *Burns* v. *Richardson, supra,* at 88. Finally, in *Gaffney* v. *Cummings, supra,* we upheld against an equal protection political gerrymandering challenge a state legislative single-member redistricting scheme that was formulated in a bipartisan effort to try to provide political representation on a level approximately proportional to the strength of political parties in the State. In that case, we adjudicated the type of purely political equal protection claim that is brought here, although we did not, as a threshold matter, expressly hold such a claim to be justiciable. Regardless of this lack of a specific holding, our consideration of the merits of the claim in *Gaffney* in the face of a discussion of justiciability in appellant's brief, combined

with our repeated reference in other opinions to the constitutional deficiencies of plans that dilute the vote of political groups, at the least supports an inference that these cases are justiciable.

In the years since *Baker* v. *Carr*, both before and after *Gaffney*, however, we have also affirmed a number of decisions in which the lower courts rejected the justiciability of purely political gerrymandering claims. In *WMCA, Inc.* v. *Lomenzo*, 382 U. S. 4 (1965), summarily aff'g 238 F. Supp. 916 (SDNY), the most frequently cited of these cases, we affirmed the decision of a three-judge District Court upholding a temporary apportionment plan for the State of New York. The District Court had determined that political gerrymandering equal protection challenges to this plan were nonjusticiable. See *id.*, at 925–926. Justice Harlan, in his opinion concurring in the Court's summary affirmance, expressed his understanding that the affirmance was based on the Court's approval of the lower court's finding of nonjusticiability. See 382 U. S., at 6. See also *Jimenez* v. *Hidalgo County Water Improvement District No. 2*, 424 U. S. 950 (1976), summarily aff'g 68 F. R. D. 668 (SD Tex. 1975); *Ferrell* v. *Hall*, 406 U. S. 939 (1972), summarily aff'g 339 F. Supp. 73 (WD Okla.); *Wells* v. *Rockefeller*, 398 U. S. 901 (1970), summarily aff'g 311 F. Supp. 48 (SDNY). Although these summary affirmances arguably support an inference that these claims are not justiciable, there are other cases in which federal or state courts adjudicated political gerrymandering claims and we summarily affirmed or dismissed for want of a substantial federal question. See, *e. g.*, *Wiser* v. *Hughes*, 459 U. S. 962 (1982), dismissing for want of a substantial federal question an appeal from *In re Legislative Districting*, 299 Md. 658, 475 A. 2d 428; *Kelly* v. *Bumpers*, 413 U. S. 901 (1973), summarily aff'g 340 F. Supp. 568 (ED Ark. 1972); *Archer* v. *Smith*, 409 U. S. 808 (1972), summarily aff'g *Graves* v. *Barnes*, 343 F. Supp. 704, 734 (WD Tex.).

These sets of cases may look in different directions, but to the extent that our summary affirmances indicate the non-justiciability of political gerrymander cases, we are not bound by those decisions. As we have observed before, "[i]t is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action." *Washington* v. *Yakima Indian Nation*, 439 U. S. 463, 477, n. 20 (1979). See also *Edelman* v. *Jordan*, 415 U. S. 651, 670–671 (1974). The issue that the appellants would have us find to be precluded by these summary dispositions is an important one, and it deserves further consideration.

## B

The outlines of the political question doctrine were described and to a large extent defined in *Baker* v. *Carr*. The synthesis of that effort is found in the following passage in the Court's opinion:

"It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

"Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority. The cases we have reviewed show the necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing." 369 U. S., at 217.

In *Baker*, the Court applied this analysis to an equal protection claim based on a state legislative apportionment that allowed substantial disparities in the number of voters represented by each state representative. See *id.*, at 253–258 (Clark, J., concurring). In holding that claim to be justiciable, the Court concluded that none of the identifying characteristics of a political question were present:

"The question here is the consistency of state action with the Federal Constitution. We have no question decided, or to be decided, by a political branch of government coequal with this Court. Nor do we risk embarrassment of our government abroad, or grave disturbance at home if we take issue with Tennessee as to the constitutionality of her action here challenged. Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action." *Id.*, at 226.

This analysis applies equally to the question now before us. Disposition of this question does not involve us in a matter more properly decided by a coequal branch of our Government. There is no risk of foreign or domestic disturbance, and in light of our cases since *Baker* we are not persuaded that there are no judicially discernible and manageable standards by which political gerrymander cases are to be decided.

It is true that the type of claim that was presented in *Baker* v. *Carr* was subsequently resolved in this Court by the formulation of the "one person, one vote" rule. See, *e. g.*, *Reynolds* v. *Sims*, 377 U. S., at 557–561. The mere fact, however, that we may not now similarly perceive a likely arithmetic presumption in the instant context does not compel a conclusion that the claims presented here are nonjusticiable. The one person, one vote principle had not yet been developed when *Baker* was decided. At that time, the Court did not rely on the potential for such a rule in finding justiciability. Instead, as the language quoted above clearly indicates, the Court contemplated simply that legislative line drawing in the districting context would be susceptible of adjudication under the applicable constitutional criteria.

Furthermore, in formulating the one person, one vote formula, the Court characterized the question posed by election districts of disparate size as an issue of fair representation. In such cases, it is not that anyone is deprived of a vote or that any person's vote is not counted. Rather, it is that one electoral district elects a single representative and another district of the same size elects two or more—the elector's vote in the former district having less weight in the sense that he may vote for and his district be represented by only one legislator, while his neighbor in the adjoining district votes for and is represented by two or more. *Reynolds* accordingly observed:

"Since the achieving of fair and effective representation for all citizens is concededly the basic aim of legislative

apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election of State legislators. Diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discriminations based upon factors such as race . . . ." 377 U. S., at 565–566.

*Reynolds* surely indicates the justiciability of claims going to the adequacy of representation in state legislatures.

The issue here is of course different from that adjudicated in *Reynolds*. It does not concern districts of unequal size. Not only does everyone have the right to vote and to have his vote counted, but each elector may vote for and be represented by the same number of lawmakers. Rather, the claim is that each political group in a State should have the same chance to elect representatives of its choice as any other political group. Nevertheless, the issue is one of representation, and we decline to hold that such claims are never justiciable.

Our racial gerrymander cases such as *White* v. *Regester* and *Whitcomb* v. *Chavis* indicate as much. In those cases, there was no population variation among the districts, and no one was precluded from voting. The claim instead was that an identifiable racial or ethnic group had an insufficient chance to elect a representative of its choice and that district lines should be redrawn to remedy this alleged defect. In both cases, we adjudicated the merits of such claims, rejecting the claim in *Whitcomb* and sustaining it in *Regester*. Just as clearly, in *Gaffney* v. *Cummings*, where the districts also passed muster under the *Reynolds* formula, the claim was that the legislature had manipulated district lines to afford political groups in various districts an enhanced opportunity to elect legislators of their choice. Although advising caution, we said that "we *must* . . . respond to [the] claims . . . that even if acceptable populationwise, the . . . plan was

invidiously discriminatory because a 'political fairness princi-
ple' was followed . . . ." 412 U. S., at 751–752 (emphasis
added). We went on to hold that the statute at issue did not
violate the Equal Protection Clause.

These decisions support a conclusion that this case is justi-
ciable. As *Gaffney* demonstrates, that the claim is submit-
ted by a political group, rather than a racial group, does not
distinguish it in terms of justiciability. That the characteris-
tics of the complaining group are not immutable or that the
group has not been subject to the same historical stigma may
be relevant to the manner in which the case is adjudicated,
but these differences do not justify a refusal to entertain such
a case.

In fact, JUSTICE O'CONNOR's attempt to distinguish this
political gerrymandering claim from the racial gerrymander-
ing claims that we have consistently adjudicated demon-
strates the futility of such an effort. Her conclusion that the
claim in this case is not justiciable seems to rest on a dual con-
cern that no judicially manageable standards exist and that
adjudication of such claims requires an initial policy decision
that the judiciary should not make. Yet she does not point
out how the standards that we set forth here for adjudicating
this political gerrymandering claim are less manageable than
the standards that have been developed for racial gerryman-
dering claims. Nor does she demonstrate what initial pol-
icy decision—regarding, for example, the desirability of fair
group representation—we have made here that we have not
made in the race cases.[9] She merely asserts that because

---

[9] As to the illegitimate policy determinations that JUSTICE O'CONNOR
believes that we have made, she points to two. The first is a preference
for nonpartisan as opposed to partisan gerrymanders, and the second is a
preference for proportionality. On a group level, however, which must be
our focus in this type of claim, neither of these policy determinations is "of
a kind clearly for nonjudicial discretion." *Baker* v. *Carr*, 369 U. S. 186,
217 (1962). The first merely recognizes that nonpartisan gerrymanders in
fact are aimed at guaranteeing rather than infringing fair group represen-
tation. The second, which is not a preference for proportionality *per se*

race has historically been a suspect classification individual minority voters' rights are more immediately related to a racial minority group's voting strength. This, in combination with "the greater warrant the Equal Protection Clause gives the federal courts to intervene for protection against racial discrimination, suffice to render racial gerrymandering claims justiciable." *Post,* at 151 (O'CONNOR, J., concurring in judgment).

Reliance on these assertions to determine justiciability would transform the narrow categories of "political questions" that *Baker* v. *Carr* carefully defined into an ad hoc litmus test of this Court's reactions to the desirability of and need for judicial application of constitutional or statutory standards to a given type of claim. JUSTICE O'CONNOR's own discussion seems to reflect such an approach: She concludes that because political gerrymandering may be a "self-limiting enterprise" there is no need for judicial intervention. *Post,* at 152. She also expresses concern that our decision today will lead to "political instability and judicial malaise," *post,* at 147, because nothing will prevent members of other identifiable groups from bringing similar claims. To begin with, JUSTICE O'CONNOR's factual assumptions are by no means obviously correct: It is not clear that political gerrymandering *is* a self-limiting enterprise or that other groups will have any great incentive to bring gerrymandering claims, given the requirement of a showing of discriminatory intent. At a more fundamental level, however, JUSTICE O'CONNOR's analysis is flawed because it focuses on the perceived need for judicial review and on the potential practical problems with allowing such review. Validation of the con-

---

but a preference for a level of parity between votes and representation sufficient to ensure that significant minority voices are heard and that majorities are not consigned to minority status, is hardly an illegitimate extrapolation from our general majoritarian ethic and the objective of fair and adequate representation recognized in *Reynolds* v. *Sims,* 377 U. S. 533 (1964).

sideration of such amorphous and wide-ranging factors in assessing justiciability would alter substantially the analysis the Court enunciated in *Baker* v. *Carr*, and we decline JUSTICE O'CONNOR's implicit invitation to rethink that approach.

### III

Having determined that the political gerrymandering claim in this case is justiciable, we turn to the question whether the District Court erred in holding that the appellees had alleged and proved a violation of the Equal Protection Clause.

### A

Preliminarily, we agree with the District Court that the claim made by the appellees in this case is a claim that the 1981 apportionment discriminates against Democrats on a statewide basis. Both the appellees and the District Court have cited instances of individual districting within the State which they believe exemplify this discrimination, but the appellees' claim, as we understand it, is that Democratic voters over the State as a whole, not Democratic voters in particular districts, have been subjected to unconstitutional discrimination. See, *e. g.*, Complaint of Bandemer Plaintiffs 3–7. Although the statewide discrimination asserted here was allegedly accomplished through the manipulation of individual district lines, the focus of the equal protection inquiry is necessarily somewhat different from that involved in the review of individual districts.

We also agree with the District Court that in order to succeed the Bandemer plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group. See, *e. g.*, *Mobile* v. *Bolden*, 446 U. S., at 67–68. Further, we are confident that if the law challenged here had discriminatory effects on Democrats, this record would support a finding that the discrimination was intentional. Thus, we decline to overturn the District Court's finding of discriminatory intent as clearly erroneous.

128

Indeed, quite aside from the anecdotal evidence, the shape of the House and Senate Districts, and the alleged disregard for political boundaries, we think it most likely that whenever a legislature redistricts, those responsible for the legislation will know the likely political composition of the new districts and will have a prediction as to whether a particular district is a safe one for a Democratic or Republican candidate or is a competitive district that either candidate might win. As we said in *Gaffney* v. *Cummings*, 412 U. S., at 752–753:

"It would be idle, we think, to contend that any political consideration taken into account in fashioning a reapportionment plan is sufficient to invalidate it. Our cases indicate quite the contrary. See *White* v. *Regester*, [412 U. S. 755 (1973)]; *Burns* v. *Richardson*, [384 U. S. 73 (1966)]; *Whitcomb* v. *Chavis*, [403 U. S. 124 (1971)]; *Abate* v. *Mundt*, [403 U. S. 182 (1971)]. The very essence of districting is to produce a different — a more 'politically fair'—result than would be reached with elections at large, in which the winning party would take 100% of the legislative seats. Politics and political considerations are inseparable from districting and apportionment. The political profile of a State, its party registration, and voting records are available precinct by precinct, ward by ward. These subdivisions may not be identical with census tracts, but, when overlaid on a census map, it requires no special genius to recognize the political consequences of drawing a district line along one street rather than another. It is not only obvious, but absolutely unavoidable, that the location and shape of districts may well determine the political complexion of the area. District lines are rarely neutral phenomena. They can well determine what district will be predominantly Democratic or predominantly Republican, or make a close race likely. Redistricting may pit incumbents against one another or make very difficult the elec-

tion of the most experienced legislator. The reality is that districting inevitably has and is intended to have substantial political consequences.

"It may be suggested that those who redistrict and reapportion should work with census, not political, data and achieve population equality without regard for political impact. But this politically mindless approach may produce, whether intended or not, the most grossly gerrymandered results; and, in any event, it is most unlikely that the political impact of such a plan would remain undiscovered by the time it was proposed or adopted, in which event the results would be both known and, if not changed, intended." [10]

As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended. [11]

## B

We do not accept, however, the District Court's legal and factual bases for concluding that the 1981 Act visited a sufficiently adverse effect on the appellees' constitutionally protected rights to make out a violation of the Equal Protection Clause. The District Court held that because any apportion-

---

[10] This passage from *Gaffney* expresses a view similar to that of Robert G. Dixon, Jr., one of the foremost scholars of reapportionment, who observed:

"[W]hether or not nonpopulation factors are expressly taken into account in shaping political districts, they are inevitably everpresent and operative. They influence all election outcomes in all sets of districts. The key concept to grasp is that there are no neutral lines for legislative districts . . . every line drawn aligns partisans and interest blocs in a particular way different from the alignment that would result from putting the line in some other place." Dixon, Fair Criteria and Procedures for Establishing Legislative Districts 7–8, in Representation and Redistricting Issues (B. Grofman, A. Lijphart, R. McKay, & H. Scarrow eds. 1982).

[11] That discriminatory intent may not be difficult to prove in this context does not, of course, mean that it need not be proved at all to succeed on such a claim.

ment scheme that purposely prevents proportional representation is unconstitutional, Democratic voters need only show that their proportionate voting influence has been adversely affected. 603 F. Supp., at 1492. Our cases, however, clearly foreclose any claim that the Constitution requires proportional representation or that legislatures in reapportioning must draw district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be. *Whitcomb* v. *Chavis*, 403 U. S., at 153, 156, 160; *White* v. *Regester*, 412 U. S., at 765–766.

The typical election for legislative seats in the United States is conducted in described geographical districts, with the candidate receiving the most votes in each district winning the seat allocated to that district. If all or most of the districts are competitive—defined by the District Court in this case as districts in which the anticipated split in the party vote is within the range of 45% to 55%—even a narrow statewide preference for either party would produce an overwhelming majority for the winning party in the state legislature. This consequence, however, is inherent in winner-take-all, district-based elections, and we cannot hold that such a reapportionment law would violate the Equal Protection Clause because the voters in the losing party do not have representation in the legislature in proportion to the statewide vote received by their party candidates. As we have said: "[W]e are unprepared to hold that district-based elections decided by plurality vote are unconstitutional in either single- or multi-member districts simply because the supporters of losing candidates have no legislative seats assigned to them." *Whitcomb* v. *Chavis, supra,* at 160. This is true of a racial as well as a political group. *White* v. *Regester, supra,* at 765–766. It is also true of a statewide claim as well as an individual district claim.

To draw district lines to maximize the representation of each major party would require creating as many safe seats

for each party as the demographic and predicted political characteristics of the State would permit. This in turn would leave the minority in each safe district without a representative of its choice. We upheld this "political fairness" approach in *Gaffney* v. *Cummings*, despite its tendency to deny safe district minorities any realistic chance to elect their own representatives. But *Gaffney* in no way suggested that the Constitution requires the approach that Connecticut had adopted in that case.

In cases involving individual multimember districts, we have required a substantially greater showing of adverse effects than a mere lack of proportional representation to support a finding of unconstitutional vote dilution. Only where there is evidence that excluded groups have "less opportunity to participate in the political processes and to elect candidates of their choice" have we refused to approve the use of multimember districts. *Rogers* v. *Lodge,* 458 U. S., at 624. See also *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 430 U. S., at 167; *White* v. *Regester, supra,* at 765–766; *Whitcomb* v. *Chavis, supra,* at 150. In these cases, we have also noted the lack of responsiveness by those elected to the concerns of the relevant groups. See *Rogers* v. *Lodge, supra,* at 625–627; *White* v. *Regester, supra,* at 766–767.[12]

These holdings rest on a conviction that the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm. This conviction, in turn, stems from a per-

---

[12] Although these cases involved racial groups, we believe that the principles developed in these cases would apply equally to claims by political groups in individual districts. We note, however, that the elements necessary to a successful vote dilution claim may be more difficult to prove in relation to a claim by a political group. For example, historical patterns of exclusion from the political processes, evidence which would support a vote dilution claim, are in general more likely to be present for a racial group than for a political group.

ception that the power to influence the political process is not limited to winning elections. An individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district. We cannot presume in such a situation, without actual proof to the contrary, that the candidate elected will entirely ignore the interests of those voters. This is true even in a safe district where the losing group loses election after election. Thus, a group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elections more difficult, and a failure of proportional representation alone does not constitute impermissible discrimination under the Equal Protection Clause. See *Mobile* v. *Bolden*, 446 U. S., at 111, n. 7 (MARSHALL, J., dissenting).

As with individual districts, where unconstitutional vote dilution is alleged in the form of statewide political gerrymandering, the mere lack of proportional representation will not be sufficient to prove unconstitutional discrimination. Again, without specific supporting evidence, a court cannot presume in such a case that those who are elected will disregard the disproportionately underrepresented group. Rather, unconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole.

Although this is a somewhat different formulation than we have previously used in describing unconstitutional vote dilution in an individual district, the focus of both of these inquiries is essentially the same.[13] In both contexts, the question is whether a particular group has been unconstitutionally de-

---

[13] Although this opinion relies on our cases relating to challenges by racial groups to individual multimember districts, nothing herein is intended in any way to suggest an alteration of the standards developed in those cases for evaluating such claims.

nied its chance to effectively influence the political process. In a challenge to an individual district, this inquiry focuses on the opportunity of members of the group to participate in party deliberations in the slating and nomination of candidates, their opportunity to register and vote, and hence their chance to directly influence the election returns and to secure the attention of the winning candidate. Statewide, however, the inquiry centers on the voters' direct or indirect influence on the elections of the state legislature as a whole. And, as in individual district cases, an equal protection violation may be found only where the electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively. In this context, such a finding of unconstitutionality must be supported by evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process.

Based on these views, we would reject the District Court's apparent holding that *any* interference with an opportunity to elect a representative of one's choice would be sufficient to allege or make out an equal protection violation, unless justified by some acceptable state interest that the State would be required to demonstrate. In addition to being contrary to the above-described conception of an unconstitutional political gerrymander, such a low threshold for legal action would invite attack on all or almost all reapportionment statutes. District-based elections hardly ever produce a perfect fit between votes and representation. The one person, one vote imperative often mandates departure from this result as does the no-retrogression rule required by § 5 of the Voting Rights Act. Inviting attack on minor departures from some supposed norm would too much embroil the judiciary in second-guessing what has consistently been referred to as a political task for the legislature, a task that should not be monitored too closely unless the express or tacit goal is to effect its removal from legislative halls. We decline to take a major

step toward that end, which would be so much at odds with our history and experience.

The view that a prima facie case of illegal discrimination in reapportionment requires a showing of more than a *de minimis* effect is not unprecedented. Reapportionment cases involving the one person, one vote principle such as *Gaffney* v. *Cummings* and *White* v. *Regester* provide support for such a requirement. In the present, considerably more complex context, it is also appropriate to require allegations and proof that the challenged legislative plan has had or will have effects that are sufficiently serious to require intervention by the federal courts in state reapportionment decisions.[14]

C

The District Court's findings do not satisfy this threshold condition to stating and proving a cause of action. In reaching its conclusion, the District Court relied primarily on the results of the 1982 elections: Democratic candidates for the State House of Representatives had received 51.9% of the votes cast statewide and Republican candidates 48.1%; yet, out of the 100 seats to be filled, Republican candidates won 57 and Democrats 43. In the Senate, 53.1% of the votes were cast for Democratic candidates and 46.9% for Republicans; of the 25 Senate seats to be filled, Republicans won 12 and Democrats 13. The court also relied upon the use of multi-member districts in Marion and Allen Counties, where Democrats or those inclined to vote Democratic in 1982 amounted to 46.6% of the population of those counties but Republicans won 86%—18 of 21—seats allocated to the districts in those counties. These disparities were enough to require a neutral

---

[14] The requirement of a threshold showing is derived from the peculiar characteristics of these political gerrymandering claims. We do not contemplate that a similar requirement would apply to our Equal Protection cases outside of this particular context.

justification by the State, which in the eyes of the District Court was not forthcoming.[15]

Relying on a single election to prove unconstitutional discrimination is unsatisfactory. The District Court observed, and the parties do not disagree, that Indiana is a swing State. Voters sometimes prefer Democratic candidates, and sometimes Republican. The District Court did not find that because of the 1981 Act the Democrats could not in one of the next few elections secure a sufficient vote to take control of the assembly. Indeed, the District Court declined to hold that the 1982 election results were the predictable consequences of the 1981 Act and expressly refused to hold that those results were a reliable prediction of future ones. The District Court did not ask by what percentage the statewide Democratic vote would have had to increase to control either the House or the Senate. The appellants argue here, without a persuasive response from the appellees, that had the Democratic candidates received an additional few percentage points of the votes cast statewide, they would have obtained a majority of the seats in both houses. Nor was there any finding that the 1981 reapportionment would consign the Democrats to a minority status in the Assembly throughout the 1980's or that the Democrats would have no hope of doing

---

[15] The District Court apparently thought that the political group suffering discrimination was all those voters who voted for Democratic Assembly candidates in 1982. Judge Pell, in dissent, argued that the allegedly disfavored group should be defined as those voters who could be counted on to vote Democratic from election to election, thus excluding those who vote the Republican ticket from time to time. He would have counted the true believers by averaging the Democratic vote cast in two different elections for those statewide offices for which party-line voting is thought to be the rule and personality and issue-oriented factors are relatively unimportant. Although accepting Judge Pell's definition of Democratic voters would have strongly suggested that the 1981 reapportionment had no discriminatory effect at all, there was no response to his position. The appellees take up the challenge in this Court, claiming that Judge Pell chose the wrong election years for the purpose of averaging the Democratic votes. The dispute need not now be resolved.

any better in the reapportionment that would occur after the 1990 census. Without findings of this nature, the District Court erred in concluding that the 1981 Act violated the Equal Protection Clause.

The District Court's discussion of the multimember districts created by the 1981 Act does not undermine this conclusion. For the purposes of the statewide political gerrymandering claim, these districts appear indistinguishable from safe Republican and safe Democratic single-member districts. Simply showing that there are multimember districts in the State and that those districts are constructed so as to be safely Republican or Democratic in no way bolsters the contention that there has been *statewide* discrimination against Democratic voters. It could be, were the necessary threshold effect to be shown, that multimember districts could be demonstrated to be suspect on the ground that they are particularly useful in attaining impermissibly discriminatory ends; at this stage of the inquiry, however, the multimember district evidence does not materially aid the appellees' case.

Furthermore, in determining the constitutionality of multimember districts challenged as racial gerrymanders, we have rejected the view that "any group with distinctive interests must be represented in legislative halls if it is numerous enough to command at least one seat and represents a minority living in an area sufficiently compact to constitute a single-member district." *Whitcomb*, 403 U. S., at 156. Rather, we have required that there be proof that the complaining minority "had less opportunity . . . to participate in the political processes and to elect legislators of their choice." *Id.*, at 149. In *Whitcomb*, we went on to observe that there was no proof that blacks were not allowed to register or vote, to choose the political party they desired to support, to participate in its affairs or to be equally represented on those occasions when candidates were chosen, or to be included among the candidates slated by the Democratic Party.

Against this background, we concluded that the failure of the minority "to have legislative seats in proportion to its population emerges more as a function of losing elections than of built-in bias against poor Negroes. The voting power of ghetto residents may have been 'cancelled out' as the District Court held, but this seems a mere euphemism for political defeat at the polls." *Id.*, at 153. *Whitcomb* accordingly rejected a challenge to multimember districts in Marion County, Indiana. A similar challenge was sustained in *White* v. *Regester,* but only by employing the same criterion, namely, that the plaintiffs must produce evidence to support a finding "that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice." 412 U. S., at 766.

This participatory approach to the legality of individual multimember districts is not helpful where the claim is that such districts discriminate against Democrats, for it could hardly be said that Democrats, any more than Republicans, are excluded from participating in the affairs of their own party or from the processes by which candidates are nominated and elected. For constitutional purposes, the Democratic claim in this case, insofar as it challenges *vel non* the legality of the multimember districts in certain counties, is like that of the Negroes in *Whitcomb* who failed to prove a racial gerrymander, for it boils down to a complaint that they failed to attract a majority of the voters in the challenged multimember districts.[16]

---

[16] It should be noted that even if the District Court correctly identified constitutional shortcomings in the House districting, this did not automatically call for invalidating the provisions for the Senate. The only relevant fact about the Senate appearing in the District Court's findings is that in the 1982 elections to fill 25 Senate seats, Democrats won 53.1% of the statewide vote and elected 13 of their candidates. That on its face is

## D

In response to our approach, JUSTICE POWELL suggests an alternative method for evaluating equal protection claims of political gerrymandering. In his view, courts should look at a number of factors in considering these claims: the nature of the legislative procedures by which the challenged redistricting was accomplished and the intent behind the redistricting; the shapes of the districts and their conformity with political subdivision boundaries; and "evidence concerning population disparities and statistics tending to show vote dilution." *Post*, at 173 (concurring in part and dissenting in part). The District Court in this case reviewed these factors in reaching its ultimate conclusion that unconstitutional vote dilution had occurred, and JUSTICE POWELL concludes that its findings on these factors—and on the ultimate question of vote discrimination—should be upheld. According to JUSTICE POWELL, those findings adequately support a conclusion that "the boundaries of the voting districts have been distorted deliberately and arbitrarily to achieve illegitimate ends." *Post*, at 165. This deliberate and arbitrary distortion of boundaries, in turn, apparently distinguishes gerrymandering in a "loose" sense, "the common practice of the party in power to choose the redistricting plan that gives it an advantage at the polls," *post*, at 164, from gerrymandering in an "unconstitutional" sense.

Although we are not completely clear as to the distinction between these two categories of gerrymander, the crux of JUSTICE POWELL's analysis seems to be that—at least in some cases—the intentional drawing of district boundaries for partisan ends and for no other reason violates the Equal Protection Clause in and of itself. We disagree, however,

---

hardly grounds for invalidating the Senate districting, and we have counselled before against striking down an entire apportionment statute when the constitutional evil could be cured by lesser means. *Whitcomb* v. *Chavis*, 403 U. S., at 160–161.

with this conception of a constitutional violation. Specifically, even if a state legislature redistricts with the specific intention of disadvantaging one political party's election prospects, we do not believe that there has been an unconstitutional discrimination against members of that party unless the redistricting does in fact disadvantage it at the polls.

Moreover, as we discussed above, a mere lack of proportionate results in one election cannot suffice in this regard. We have reached this conclusion in our cases involving challenges to individual multimember districts, and it applies equally here. In the individual multimember district cases, we have found equal protection violations only where a history of disproportionate results appeared in conjunction with strong indicia of lack of political power and the denial of fair representation. See *supra*, at 131. In those cases, the racial minorities asserting the successful equal protection claims had essentially been shut out of the political process.[17] In the statewide political gerrymandering context, these prior cases lead to the analogous conclusion that equal protection violations may be found only where a history (actual or projected) of disproportionate results appears in conjunction

---

[17] Although JUSTICE POWELL asserts that we mischaracterize these cases and that any effects in addition to disproportionality were required to be demonstrated only to prove discriminatory intent, we note that the effects test we cite was initially set forth in *White* v. *Regester*, 412 U. S. 755 (1973), which was decided before the Court expressly determined that proof of discriminatory intent was a necessary component of an equal protection claim. Moreover, the Voting Rights Act, which to a large extent borrowed the effects test from *White*, explicitly declined to require any showing of discriminatory intent. It may be true that our more recent cases have turned on the question of discriminatory intent, but that does not imply that we have abandoned the effects discussion we adopted earlier. Moreover, we believe that JUSTICE POWELL incorrectly asserts that more than one election must pass before a successful racial or political gerrymandering claim may be brought. *Post*, at 171–172, n. 10 (concurring in part and dissenting in part). *Projected* election results based on district boundaries and past voting patterns may certainly support this type of claim, even where *no* election has yet been held under the challenged districting.

140

with similar indicia. The mere lack of control of the General Assembly after a single election does not rise to the requisite level.

This requirement of more than a showing of possibly transitory results is where we appear to depart from JUSTICE POWELL. Stripped of its "factors" verbiage, JUSTICE POWELL's analysis turns on a determination that a lack of proportionate election results can support a finding of an equal protection violation, at least in some circumstances. Here, the only concrete effect on the Democrats in Indiana in terms of election results that the District Court had before it was one election in which the percentage of Democrats elected was lower than the percentage of total Democratic votes cast.[18] In JUSTICE POWELL's view, this disproportionality, when combined with clearly discriminatory intent on the part of the 1981 General Assembly and the manipulation of district lines in the apportionment process, is sufficient to conclude that fair representation has been denied.

The factors other than disproportionate election results, however, do not contribute to a finding that Democratic voters have been disadvantaged in fact. They support a finding that an intention to discriminate was present and that districts were drawn in accordance with that intention, but they do not show any actual disadvantage beyond that shown by the election results: It surely cannot be an actual disadvantage in terms of fair representation on a group level just to be placed in a district with a supermajority of other Demo-

[18] JUSTICE POWELL proffers additional election results from the 1984 elections in support of his conclusion. These results were not considered by the District Court, and we decline to determine their significance without the benefit of any factual development as to their meaning in terms of Democratic power overall or in the long run. Nevertheless, we note that in terms of actual percentages, the 1984 House election results cited by JUSTICE POWELL exhibited less of a discrepancy between Democratic votes cast and Democratic representatives elected than did the 1982 results (5% as opposed to 8%). This casts at least some doubt on the import of the 1982 results.

cratic voters or a district that departs from pre-existing political boundaries. Only when such placement affects election results and political power statewide has an actual disadvantage occurred.

Consequently, JUSTICE POWELL's view would allow a constitutional violation to be found where the only proven effect on a political party's electoral power was disproportionate results in one (or possibly two) elections. This view, however, contains no explanation of why a lack of proportionate election results should suffice in these political gerrymandering cases while it does not in the cases involving racial gerrymandering. In fact, JUSTICE POWELL's opinion is silent as to the relevance of the substantive standard developed in the multimember district cases to these political gerrymandering cases.

In rejecting JUSTICE POWELL's approach, we do not mean to intimate that the factors he considers are entirely irrelevant. The election results obviously are relevant to a showing of the effects required to prove a political gerrymandering claim under our view. And the district configurations may be combined with vote projections to predict future election results, which are also relevant to the effects showing. The other factors, even if not relevant to the effects issue, might well be relevant to an equal protection claim. The equal protection argument would proceed along the following lines: If there were a discriminatory effect and a discriminatory intent, then the legislation would be examined for valid underpinnings. Thus, evidence of exclusive legislative process and deliberate drawing of district lines in accordance with accepted gerrymandering principles would be relevant to intent, and evidence of valid and invalid configuration would be relevant to whether the districting plan met legitimate state interests.

This course is consistent with our equal protection cases generally and is the course we follow here: We assumed that there was discriminatory intent, found that there was insuffi-

cient discriminatory effect to constitute an equal protection violation,[19] and therefore did not reach the question of the state interests (legitimate or otherwise) served by the particular districts as they were created by the legislature. Consequently, the valid or invalid configuration of the districts was an issue we did not need to consider.[20]

It seems inappropriate, however, to view these separate components of an equal protection analysis as "factors" to be considered together without regard for their separate functions or meaning. This undifferentiated consideration of the various factors confuses the import of each factor and disguises the essential conclusion of JUSTICE POWELL's opinion: that disproportionate election results alone are a sufficient effect to support a finding of a constitutional violation.

In sum, we decline to adopt the approach enunciated by JUSTICE POWELL. In our view, that approach departs from our past cases and invites judicial interference in legislative districting whenever a political party suffers at the polls. We recognize that our own view may be difficult of application. Determining when an electoral system has been "ar-

---

[19] In most equal protection cases, it is true, a discriminatory effect will be readily apparent, and no heightened effect will be required, see n. 14, *supra*, but that is the only real difference between this type of equal protection claim and others.

[20] Thus, we have rejected none of the District Court's subsidiary factual conclusions. We have merely, based on our view of the applicable law, disregarded those that were irrelevant in this case and held insufficient those that inadequately supported the District Court's ultimate legal conclusions. Specifically, we have not rejected the District Court's finding of discriminatory intent. Nor have we rejected the District Court's findings as to any of the election results or the contours of particular districts. We have simply determined that aside from the election results, none of the facts found by the District Court were relevant to the question of discriminatory effects. Consequently, since we did not need to progress beyond that point, given our conclusion that no unconstitutional discriminatory effects were shown as a matter of law, we did not need to consider the District Court's factual findings on the other "factors" addressed by JUSTICE POWELL.

ranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole," *supra*, at 132, is of necessity a difficult inquiry.[21] Nevertheless, we believe that it recognizes the delicacy of intruding on this most political of legislative functions and is at the same time consistent with our prior cases regarding individual multimember districts, which have formulated a parallel standard.[22]

## IV

In sum, we hold that political gerrymandering cases are properly justiciable under the Equal Protection Clause. We also conclude, however, that a threshold showing of discriminatory vote dilution is required for a prima facie case of an equal protection violation. In this case, the findings made by the District Court of an adverse effect on the appellees do not surmount the threshold requirement. Consequently, the judgment of the District Court is

*Reversed.*

CHIEF JUSTICE BURGER, concurring in the judgment.

I join JUSTICE O'CONNOR's opinion.

It is not surprising that citizens who are troubled by gerrymandering turn first to the courts for redress. De Tocqueville, that perceptive commentator on our country, observed that "[s]carcely any question arises in the United States which does not become, sooner or later, a subject of judicial debate." 1 A. De Tocqueville, Democracy in America 330 (H. Reeve trans. 1961). What I question is the Court's urge

---

[21] Although we recognize the difficulty of this inquiry, we do not share JUSTICE O'CONNOR's apparent lack of faith in the lower courts' abilities to distinguish between disproportionality *per se* and the lack of fair representation that continued disproportionality in conjunction with other indicia may demonstrate. See *post*, at 157 (opinion concurring in judgment).

[22] We are puzzled by JUSTICE POWELL's conclusion that we contemplate a test under which only the "one person, one vote" requirement has any relevance. This opinion clearly does not adopt such a limited review.

to craft a judicial remedy for this perceived "injustice." In my view, the Framers of the Constitution envisioned quite a different scheme. They placed responsibility for correction of such flaws in the people, relying on them to influence their elected representatives. As Justice Frankfurter wrote when the Court entered this political arena:

> "The Framers carefully and with deliberate forethought refused so to enthrone the judiciary. In this situation, as in others of like nature, appeal for relief does not belong here. Appeal must be to an informed, civically militant electorate. In a democratic society like ours, relief must come through an aroused popular conscience that sears the conscience of the people's representatives. In any event there is nothing judicially more unseemly nor more self-defeating than for this Court to make *in terrorem* pronouncements, to indulge in merely empty rhetoric, sounding a word of promise to the ear, sure to be disappointing to the hope." *Baker* v. *Carr,* 369 U. S. 186, 270 (1962) (dissenting opinion).

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in the judgment.

Today the Court holds that claims of political gerrymandering lodged by members of one of the political parties that make up our two-party system are justiciable under the Equal Protection Clause of the Fourteenth Amendment. Nothing in our precedents compels us to take this step, and there is every reason not to do so. I would hold that the partisan gerrymandering claims of major political parties raise a nonjusticiable political question that the judiciary should leave to the legislative branch as the Framers of the Constitution unquestionably intended. Accordingly, I would reverse the District Court's judgment on the grounds that appellees' claim is nonjusticiable.

There can be little doubt that the emergence of a strong and stable two-party system in this country has contributed

enormously to sound and effective government. The preservation and health of our political institutions, state and federal, depends to no small extent on the continued vitality of our two-party system, which permits both stability and measured change. The opportunity to control the drawing of electoral boundaries through the legislative process of apportionment is a critical and traditional part of politics in the United States, and one that plays no small role in fostering active participation in the political parties at every level. Thus, the legislative business of apportionment is fundamentally a political affair, and challenges to the manner in which an apportionment has been carried out—by the very parties that are responsible for this process—present a political question in the truest sense of the term.

To turn these matters over to the federal judiciary is to inject the courts into the most heated partisan issues. It is predictable that the courts will respond by moving away from the nebulous standard a plurality of the Court fashions today and toward some form of rough proportional representation for all political groups. The consequences of this shift will be as immense as they are unfortunate. I do not believe, and the Court offers not a shred of evidence to suggest, that the Framers of the Constitution intended the judicial power to encompass the making of such fundamental choices about how this Nation is to be governed. Nor do I believe that the proportional representation towards which the Court's expansion of equal protection doctrine will lead is consistent with our history, our traditions, or our political institutions.

The Court pays little heed to these considerations, which should inform any sensible jurisprudence of Article III and of the Equal Protection Clause. The Court's reflexive application of precedent ignores the maxim that "[p]articularly in dealing with claims under broad provisions of the Constitution, which derive content by an interpretative process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave

rise to them, must not be applied out of context in disregard of variant controlling facts." *Gomillion* v. *Lightfoot*, 364 U. S. 339, 343–344 (1960). In cases such as this one, which may profoundly affect the governance of this Nation, it is not enough to cite precedent: we should examine it for possible limits, and if they are lacking, for possible flaws.

I

Appellees are Indiana Democrats who claim that Indiana's 1981 state apportionment discriminates against Democrats on a statewide basis by diluting their votes, thereby depriving them of "their proportionate share of political influence." *Baker* v. *Carr*, 369 U. S. 186, 299 (1962) (Frankfurter, J., dissenting). The Court, relying principally on *Baker* v. *Carr, supra, Reynolds* v. *Sims*, 377 U. S. 533 (1964), *Gaffney* v. *Cummings*, 412 U. S. 735 (1973), and the line of racial gerrymandering cases including *Rogers* v. *Lodge*, 458 U. S. 613 (1982), and *White* v. *Regester*, 412 U. S. 755 (1973), holds that appellees' "purely political equal protection claim," *ante*, at 119, does not present a political question and is therefore justiciable. Specifically, the Court holds that the fact that a vote dilution claim "is submitted by a political group, rather than a racial group, does not distinguish it in terms of justiciability." *Ante*, at 125.

A plurality of the Court recognizes, however, that "[i]nviting attack on minor departures from some supposed norm would too much embroil the judiciary in second-guessing what has consistently been referred to as a political task for the legislature, a task that should not be monitored too closely unless the express or tacit goal is to effect its removal from legislative halls." *Ante*, at 133. Accordingly, although the plurality's analysis is generally modeled on the racial gerrymandering cases, the plurality would require a somewhat different threshold showing that the apportionment has discriminatory effects: "unconstitutional discrimination occurs only when the electoral system is arranged in a

manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Ante,* at 132.

The step taken today is a momentous one, which if followed in the future can only lead to political instability and judicial malaise. If members of the major political parties are protected by the Equal Protection Clause from dilution of their voting strength, then members of every identifiable group that possesses distinctive interests and tends to vote on the basis of those interests should be able to bring similar claims. Federal courts will have no alternative but to attempt to recreate the complex process of legislative apportionment in the context of adversary litigation in order to reconcile the competing claims of political, religious, ethnic, racial, occupational, and socioeconomic groups. Even if there were some way of limiting such claims to organized political parties, the fact remains that the losing party or the losing group of legislators in every reapportionment will now be invited to fight the battle anew in federal court. Apportionment is so important to legislators and political parties that the burden of proof the plurality places on political gerrymandering plaintiffs is unlikely to deter the routine lodging of such complaints. Notwithstanding the plurality's threshold requirement of discriminatory effects, the Court's holding that political gerrymandering claims are justiciable has opened the door to pervasive and unwarranted judicial superintendence of the legislative task of apportionment. There is simply no clear stopping point to prevent the gradual evolution of a requirement of roughly proportional representation for every cohesive political group.

In my view, this enterprise is flawed from its inception. The Equal Protection Clause does not supply judicially manageable standards for resolving purely political gerrymandering claims, and no group right to an equal share of political power was ever intended by the Framers of the Fourteenth Amendment. The Court rests its case on precedent, but

the cases on which the Court relies do not require that we take this next and most far-reaching step into the "political thicket." *Colegrove* v. *Green*, 328 U. S. 549, 556 (1946) (opinion of Frankfurter, J.).

*Baker* v. *Carr* reaffirmed that a lawsuit will be held to involve a political question where there is "a lack of judicially discoverable and manageable standards for resolving it," or where "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion" is apparent. 369 U. S., at 217. The Court first found a workable constitutional standard for applying the Equal Protection Clause to state legislative districting in *Reynolds* v. *Sims*, *supra*. But until today the Court has not extended the principles of *Baker* v. *Carr* and *Reynolds* v. *Sims* to test a legislative districting plan on grounds of partisan political gerrymandering. Indeed, one year after *Reynolds* v. *Sims*, the Court was unanimous in summarily affirming a judgment determining that a political gerrymandering challenge was nonjusticiable; as Justice Harlan pointed out, the Court's action constituted a rejection of "contentions that . . . partisan 'gerrymandering' may be subject to federal constitutional attack under the Fourteenth Amendment." *WMCA, Inc.* v. *Lomenzo*, 382 U. S. 4, 6 (1965) (concurring opinion).

The question raised again today, 21 years later, is whether a court can apply the familiar "[j]udicial standards under the Equal Protection Clause," *Baker* v. *Carr*, 369 U. S., at 226, without being forced to make a nonjudicial policy determination or to resort to a standard that is not judicially manageable. In order to answer that question, it is necessary to interpret the Equal Protection Clause. As Justice Harlan pointed out in his dissent in *Baker* v. *Carr*, "[t]he suggestion . . . that courts lack standards by which to decide such cases as this, is relevant not only to the question of 'justiciability,' but also, and perhaps more fundamentally, to the determination whether any cognizable constitutional claim has been asserted in this case." *Id.*, at 337. *Baker* v. *Carr*

itself involved just such an initial interpretation of the Equal Protection Clause: the Court in effect ruled that an arbitrary and capricious discrimination against individual voters with respect to the weight of their votes would state a cognizable claim under the Equal Protection Clause. See *id.*, at 226; *id.*, at 338–339 (Harlan, J., dissenting). That threshold determination about the reach and meaning of the Equal Protection Clause was the basis for the Court's holding that the complaint of the Tennessee voters was justiciable. Even this "arbitrary and capricious" standard threatened to prove unmanageable, but the difficulty was pretermitted when a relatively simple and judicially manageable requirement of population equality among districts was adopted the following Term in *Reynolds* v. *Sims.* See Bickel, The Supreme Court and Reapportionment, in Reapportionment in the 1970's, pp. 57, 64 (N. Polsby ed. 1971).

*Baker* v. *Carr* does not require that we hold that the right asserted in this case is similarly within the intendment of the Equal Protection Clause and determinable under the standards developed to enforce that Clause. The right asserted in *Baker* v. *Carr* was an individual right to a vote whose weight was not arbitrarily subjected to "debasement," 369 U. S., at 194. The rights asserted in this case are *group* rights to an equal share of political power and representation, and the "arbitrary and capricious" standard discussed in *Baker* v. *Carr* cannot serve as the basis for recognizing such rights. Indeed, the Court today does not rely on such a standard.

Instead, the Court justifies the extension of vote dilution claims to mainstream political groups with the pronouncement that *"Reynolds* surely indicates the justiciability of claims going to the adequacy of representation in state legislatures." *Ante,* at 124. But *Reynolds* makes plain that the one person, one vote principle safeguards the individual's right to vote, not the interests of political groups: "To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or

there is not a legitimate reason for overweighting or diluting the efficacy of his vote." 377 U. S., at 567. For that reason, "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State." *Id.*, at 568. Thus, the right guaranteed by the Equal Protection Clause as interpreted in *Reynolds* is "the right of *each voter* to 'have his vote weighted equally with those of all other citizens.'" *Mobile* v. *Bolden,* 446 U. S. 55, 78 (1980) (plurality opinion).

In the case of mainstream political groups, the Court has not accepted the argument that an "asserted entitlement to group representation," *Bolden,* 446 U. S., at 77, can be traced to the one person, one vote principle:

> "It is, of course, true that the right of a person to vote on an equal basis with other voters draws much of its significance from the political associations that its exercise reflects, but it is an altogether different matter to conclude that political groups themselves have an independent constitutional claim to representation. And the Court's decisions hold squarely that they do not." *Id.*, at 78–79 (citing *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 430 U. S. 144 (1977); *White* v. *Regester,* 412 U. S. 755 (1973); and *Whitcomb* v. *Chavis,* 403 U. S. 124 (1971)).

Where representation is apportioned substantially on a population basis, it is "obvious that nobody's vote has been 'diluted' in the sense in which that word was used in the *Reynolds* case." *Bolden, supra,* at 78. Thus, the individual's right to vote does not imply that political groups have a right to be free from discriminatory impairment of their group voting strength. Treating the vote dilution claims of political groups as cognizable would effectively collapse the "fundamental distinction between state action that inhibits an individual's right to vote and state action that affects the political strength of various groups that compete for leadership

in a democratically governed community." *Bolden, supra,* at 83 (STEVENS, J., concurring in judgment).

Nor do this Court's racial gerrymandering cases require the recognition of any such group right outside the context of racial discrimination. As Justice Frankfurter observed:

> "The cases involving Negro disfranchisement are no exception to the principle of avoiding federal judicial intervention into matters of state government in the absence of an explicit and clear constitutional imperative. For here the controlling command of Supreme Law is plain and unequivocal. An end of discrimination against the Negro was the compelling motive of the Civil War Amendments. The Fifteenth expresses this in terms, and it is no less true of the Equal Protection Clause of the Fourteenth. *Slaughter-House Cases,* 16 Wall. 36, 67–72; *Strauder* v. *West Virginia,* 100 U. S. 303, 306–307; *Nixon* v. *Herndon,* 273 U. S. 536, 541." *Baker* v. *Carr,* 369 U. S., at 285–286 (dissenting opinion).

In my view, where a racial minority group is characterized by "the traditional indicia of suspectness" and is vulnerable to exclusion from the political process, *San Antonio Independent School District* v. *Rodriguez,* 411 U. S. 1, 28 (1973); see also *Johnson* v. *Robison,* 415 U. S. 361, 375, n. 14 (1974), individual voters who belong to that group enjoy some measure of protection against intentional dilution of their group voting strength by means of racial gerrymandering. As a matter of past history and present reality, there is a direct and immediate relationship between the racial minority's group voting strength in a particular community and the individual rights of its members to vote and to participate in the political process. In these circumstances, the stronger nexus between individual rights and group interests, and the greater warrant the Equal Protection Clause gives the federal courts to intervene for protection against racial discrimination, suffice to render racial gerrymandering claims justiciable. Even so, the individual's right is infringed only if the racial minority

group can prove that it has "essentially been shut out of the political process." *Ante*, at 139.

Clearly, members of the Democratic and Republican Parties cannot claim that they are a discrete and insular group vulnerable to exclusion from the political process by some dominant group: these political parties *are* the dominant groups, and the Court has offered no reason to believe that they are incapable of fending for themselves through the political process. Indeed, there is good reason to think that political gerrymandering is a self-limiting enterprise. See B. Cain, The Reapportionment Puzzle 151–159 (1984). In order to gerrymander, the legislative majority must weaken some of its safe seats, thus exposing its own incumbents to greater risks of defeat—risks they may refuse to accept past a certain point. *Id.*, at 154–155. Similarly, an overambitious gerrymander can lead to disaster for the legislative majority: because it has created more seats in which it hopes to win relatively narrow victories, the same swing in overall voting strength will tend to cost the legislative majority more and more seats as the gerrymander becomes more ambitious. *Id.*, at 152. More generally, each major party presumably has ample weapons at its disposal to conduct the partisan struggle that often leads to a partisan apportionment, but also often leads to a bipartisan one. There is no proof before us that political gerrymandering is an evil that cannot be checked or cured by the people or by the parties themselves. Absent such proof, I see no basis for concluding that there is a need, let alone a constitutional basis, for judicial intervention.

The plurality agrees that it would be unwise to "embroil the judiciary in second-guessing what has consistently been referred to as a political task for the legislature." *Ante*, at 133. Moreover, the plurality is willing to presume that elected candidates will not ignore the interests of voters for the losing candidate, and it correctly observes that "the power to influence the political process is not limited to win-

ning elections." *Ante*, at 132. But these propositions support my position—that the costs of judicial intervention will be severe and that political gerrymandering simply does not cause intolerable harm to the ability of major political groups to advance their interests.

Moreover, the new group right created by today's decision is particularly unjustifiable in the context of the claim here, which is founded on a supposed diminution of the *statewide* voting influence of a political group. None of the elections for the Indiana Legislature are statewide. Voters in each district elect their representatives from that district. To treat the loss of candidates nominated by the party of a voter's choice as a harm to the individual voter, when that voter cannot vote for such candidates and is not represented by them in any direct sense, clearly exceeds the limits of the Equal Protection Clause. On the Court's reasoning, members of a political party in one State should be able to challenge a congressional districting plan adopted in any other State, on the grounds that their party is unfairly represented in that State's congressional delegation, thus injuring them as members of the national party.

The Court's reliance on *Gaffney* v. *Cummings*, 412 U. S. 735 (1973), is insufficient to overcome these objections to a general group right to equal political representation. Although *Gaffney* treated a political gerrymandering claim as justiciable, the opinion's observation that "districting inevitably has and is intended to have substantial political consequences," *id.*, at 753, and its reluctance to undertake "the impossible task of extirpating politics from what are the essentially political processes of the sovereign States," *id.*, at 754, would equally support a holding that whatever harms political gerrymandering may sometimes occasion should be tolerated as inextricably associated with the legislative business of redistricting. In addition, since *Gaffney* rejected the challenge to bipartisan gerrymandering out of hand, the Court simply did not confront the difficulties in framing a

manageable standard for adjudicating such claims. Accordingly, *Gaffney* should not bar a full consideration of those difficulties here.

Furthermore, the Court fails to explain why a bipartisan gerrymander—which is what was approved in *Gaffney*—affects individuals any differently than a partisan gerrymander, which the Court makes vulnerable to constitutional challenge today. In *Gaffney*, Connecticut, as part of a bipartisan effort, had drawn up a plan intended to "provide a rough sort of proportional representation," *id.*, at 754, for the two major political parties. The Court declined to invalidate this plan, which undertook "not to minimize or eliminate the political strength of any group or party, but to recognize it," *ibid.*, and suggested that "judicial interest should be at its lowest ebb when a State purports fairly to allocate political power to the parties in accordance with their voting strength and, within quite tolerable limits, succeeds in doing so." *Ibid.* (citations omitted).

A bipartisan gerrymander employs the same technique, and has the same effect on individual voters, as does a partisan gerrymander. In each instance, groups of individuals are assigned to districts with an eye towards promoting the ends of a political party and its incumbent legislators. Some groups within each party will lose any chance to elect a representative who belongs to their party, because they have been assigned to a district in which the opposing party holds an overwhelming advantage. Independent voters may lose any chance to influence the outcome of elections in their district, if one party has a sufficiently strong majority. As the plurality acknowledges, the scheme upheld in *Gaffney* tended to "deny safe district minorities any realistic chance to elect their own representatives." *Ante,* at 131. If this bipartisan arrangement between two groups of self-interested legislators is constitutionally permissible, as I believe and as the Court held in *Gaffney*, then—in terms of the rights of individuals—it should be equally permissible for a legislative major-

ity to employ the same means to pursue its own interests over the opposition of the other party.

The Court's determination to treat the claims of mainstream political parties as justiciable thus emerges as precisely the sort of "initial policy determination of a kind clearly for nonjudicial discretion" that *Baker* v. *Carr* recognized as characteristic of political questions. 369 U. S., at 217. The Court has in effect decided that it is constitutionally acceptable for both parties to "waste" the votes of individuals through a bipartisan gerrymander, so long as the *parties* themselves are not deprived of their group voting strength to an extent that will exceed the plurality's threshold requirement. This choice confers greater rights on powerful political groups than on individuals; that cannot be the meaning of the Equal Protection Clause.

## II

The standard the plurality proposes exemplifies the intractable difficulties in deriving a judicially manageable standard from the Equal Protection Clause for adjudicating political gerrymandering claims. The plurality rejects any standard that would require drawing "district lines to come as near as possible to allocating seats to the contending parties in proportion to what their anticipated statewide vote will be," *ante*, at 130, and states that "unconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Ante*, at 132. In my view, this standard will over time either prove unmanageable and arbitrary or else evolve towards some loose form of proportionality. Cf. Shapiro, Gerrymandering, Unfairness, and the Supreme Court, 33 UCLA L. Rev. 227, 252–256 (1985). Either outcome would be calamitous for the federal courts, for the States, and for our two-party system.

Vote dilution analysis is far less manageable when extended to major political parties than if confined to racial minority groups. First, an increase in the number of competing claims to equal group representation will make judicial review of apportionment vastly more complex. Designing an apportionment plan that does not impair or degrade the voting strength of several groups is more difficult than designing a plan that does not have such an effect on one group for the simple reason that, as the number of criteria the plan must meet increases, the number of solutions that will satisfy those criteria will decrease. Even where it is not impossible to reconcile the competing claims of political, racial, and other groups, the predictable result will be greater judicial intrusion into the apportionment process.

Second, while membership in a racial group is an immutable characteristic, voters can—and often do—move from one party to the other or support candidates from both parties. Consequently, the difficulty of measuring voting strength is heightened in the case of a major political party. It is difficult enough to measure "a voter's or a group of voters' influence on the political process as a whole," *ante*, at 132, when the group is a racial minority in a particular district or community. When the group is a major political party the difficulty is greater, and the constitutional basis for intervening far more tenuous.

Moreover, any such intervention is likely to move in the direction of proportional representation for political parties. This is clear by analogy to the problem that arises in racial gerrymandering cases: "in order to decide whether an electoral system has made it harder for minority voters to elect the candidates they prefer, a court must have an idea in mind of how hard it 'should' be for minority voters to elect their preferred candidates under an acceptable system." *Thornburg* v. *Gingles, ante*, at 88 (O'CONNOR, J., concurring in judgment). Any such norm must make some reference, even if only a loose one, to the relation between the racial

minority group's share of the electorate and its share of the elected representatives. In order to implement the plurality's standard, it will thus be necessary for courts to adopt an analogous norm, in order to assess whether the voting strength of a political party has been "degraded" by an apportionment, either on a statewide basis or in particular districts. Absent any such norm, the inquiry the plurality proposes would be so standardless as to make the adjudication of political gerrymandering claims impossible.

Implicit in the plurality's opinion today is at least some use of simple proportionality as the standard for measuring the normal representational entitlements of a political party. That is why the plurality can say that "a history (actual or projected) of disproportionate results," together with proof of "the denial of fair representation" and of "lack of political power," will constitute an equal protection violation. *Ante,* at 139. To be sure, the plurality has qualified its use of a *standard* of proportional representation in a variety of ways so as to avoid a *requirement* of proportional representation. The question is whether these qualifications are likely to be enduring in the face of the tremendous political pressures that courts will confront when called on to decide political gerrymandering claims. Because the most easily measured indicia of political power relate solely to winning and losing elections, there is a grave risk that the plurality's various attempts to qualify and condition the group right the Court has created will gradually pale in importance. What is likely to remain is a loose form of proportionality, under which *some* deviations from proportionality are permissible, but any significant, persistent deviations from proportionality are suspect. Courts will be forced to look for some form of "undue" disproportion lity with respect to electoral success if political gerrymander ç claims are justiciable, because otherwise they will find t r decisions turning on imponderables such as whether the le ators of one party have fairly represented the voters of th ther.

Of course, in one sense a requirement of proportional representation, whether loose or absolute, is judicially manageable. If this Court were to declare that the Equal Protection Clause required proportional representation within certain fixed tolerances, I have no doubt that district courts would be able to apply this edict. The flaw in such a pronouncement, however, would be the use of the Equal Protection Clause as the vehicle for making a fundamental policy choice that is contrary to the intent of its Framers and to the traditions of this Republic. The political question doctrine as articulated in *Baker* v. *Carr* rightly requires that we refrain from making such policy choices in order to evade what would otherwise be a lack of judicially manageable standards. See 369 U. S., at 217.

Unfortunately, a drift towards proportional representation is apparent even in the plurality opinion. Although at times the plurality seems to require that the political party be "essentially . . . shut out of the political process" before a constitutional violation will be found, *ante*, at 139, the plurality's explanation of the deficiencies in the District Court's approach focuses not on access to the political process as a whole, but entirely on statewide electoral success. Thus, the critical inquiry appears to be into whether the complaining political party could be expected to regain control of the state legislature in the next few elections if backed by a majority of voters. *Ante*, at 135–136. As an aid in this inquiry, courts must apparently also ask "by what percentage the statewide . . . vote" for the complaining political party would have to increase to control the legislature or one of its Houses. *Ibid.*

Under the plurality's approach, where it is shown that under a challenged apportionment plan one party will consistently fail to gain control of the legislature even if it wins a majority of the votes, a court would be justified in finding the "threshold showing" met, at which point "the legislation would be examined for valid underpinnings." *Ante*, at 141.

It may fairly be doubted that this last step is anything more than a formality, except perhaps in the case of bipartisan gerrymanders that have proved unexpectedly favorable to one party. Consequently, although the plurality criticizes JUSTICE POWELL for effectively concluding that "disproportionate election results alone are a sufficient effect to support a finding of a constitutional violation," *ante*, at 142, the plurality itself arrives at the conclusion that foreseeable, disproportionate *long-term* election results suffice to prove a constitutional violation.

Thus, the plurality opinion ultimately rests on a political preference for proportionality—not an outright claim that proportional results are required, but a conviction that the greater the departure from proportionality, the more suspect an apportionment plan becomes. This preference for proportionality is in serious tension with essential features of state legislative elections. Districting itself represents a middle ground between winner-take-all statewide elections and proportional representation for political parties. If there is a constitutional preference for proportionality, the legitimacy of districting itself is called into question: the voting strength of less evenly distributed groups will invariably be diminished by districting as compared to at-large proportional systems for electing representatives. Moreover, one implication of the districting system is that voters cast votes for candidates in their districts, not for a statewide slate of legislative candidates put forward by the parties. Consequently, efforts to determine party voting strength presuppose a norm that does not exist—statewide elections for representatives along party lines.

The plurality's theory is also internally inconsistent. The plurality recognizes that, given a normal dispersion of party strength and winner-take-all, district-based elections, it is likely that even a narrow statewide preference for one party will give that party a disproportionately large majority in the legislature. *Ante*, at 130. The plurality is prepared to tol-

erate this effect, because not to do so would spell the end of district-based elections, or require reverse gerrymandering to ensure greater proportionality for the minority party. But this means that the plurality would extend greater protection to a party that can command a majority of the state-wide vote than to a party that cannot: the explanation, once again, is that the plurality has made a political judgment—in this instance, that district-based elections must be taken as a given.

Because a statewide majority for a party's candidates will frequently result only if the "winning" party attracts independent voters and voters from the other party, under the plurality's approach a great deal will turn on whether the support of these voters is included as part of the party's voting strength. The plurality would reserve this question, but, however it is ultimately answered, anomalies will result. To measure a party's voting strength by including voters who only occasionally vote for that party's candidates is arbitrary; to ignore the role these voters play will be to further discriminate against parties that do not command a permanent majority of the electorate in a given State.

I would avoid the difficulties generated by the plurality's efforts to confine the effects of a generalized group right to equal representation by not recognizing such a right in the first instance. To allow district courts to strike down apportionment plans on the basis of their prognostications as to the outcome of future elections or future apportionments invites "findings" on matters as to which neither judges nor anyone else can have any confidence. Once it is conceded that "a group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elections more difficult," *ante*, at 132, the virtual impossibility of reliably predicting how difficult it will be to win an election in 2, or 4, or 10 years should, in my view, weigh in favor of holding such challenges nonjusticiable. Racial gerrymandering should remain justiciable, for the harms it en-

genders run counter to the central thrust of the Fourteenth Amendment. But no such justification can be given for judicial intervention on behalf of mainstream political parties, and the risks such intervention poses to our political institutions are unacceptable. "Political affiliation is the keystone of the political trade. Race, ideally, is not." *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey,* 430 U. S., at 171, n. 1 (BRENNAN, J., concurring).

· JUSTICE POWELL, with whom JUSTICE STEVENS joins, concurring in part and dissenting in part.

This case presents the question whether a state legislature violates the Equal Protection Clause by adopting a redistricting plan designed solely to preserve the power of the dominant political party, when the plan follows the doctrine of "one person, one vote" but ignores all other neutral factors relevant to the fairness of redistricting.[1]

In answering this question, the plurality expresses the view, with which I agree, that a partisan political gerrymander violates the Equal Protection Clause only on proof of "both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Ante,* at 127. The plurality acknowledges that the record in this case supports a finding that the challenged redistricting plan was adopted for the purpose of discriminating against Democratic voters. *Ibid.* The plurality argues, however,

---

[1] This opinion uses the term "redistricting" to refer to the process by which state legislators draw the boundaries of voting districts. The terms "redistricting," "apportionment," and "reapportionment" frequently are used interchangeably. Backstrom, Robins, & Eller, Issues in Gerrymandering: An Exploratory Measure of Partisan Gerrymandering Applied to Minnesota, 62 Minn. L. Rev. 1121, 1121, n. 1 (1978); Grofman, Criteria for Districting: A Social Science Perspective, 33 UCLA L. Rev. 77, 78, n. 6 (1985). Technically, the words "apportionment" and "reapportionment" apply to the "allocation of a finite number of representatives among a fixed number of pre-established areas," while "districting" and "redistricting" refer to the drawing of district lines. Backstrom, Robins, & Eller, *supra,* at 1121, n. 1; see Grofman, *supra,* at 78, n. 6.

that appellees failed to establish that their voting strength was diluted statewide despite uncontradicted proof that certain key districts were grotesquely gerrymandered to enhance the election prospects of Republican candidates. This argument appears to rest solely on the ground that the legislature accomplished its gerrymander consistent with "one person, one vote," in the sense that the legislature designed voting districts of approximately equal population and erected no direct barriers to Democratic voters' exercise of the franchise. Since the essence of a gerrymandering claim is that the members of a political party as a group have been denied their right to "fair and effective representation," *Reynolds* v. *Sims*, 377 U. S. 533, 565 (1964), I believe that the claim cannot be tested solely by reference to "one person, one vote." Rather, a number of other relevant neutral factors must be considered. Because the plurality ignores such factors and fails to enunciate standards by which to determine whether a legislature has enacted an unconstitutional gerrymander, I dissent.

I

The facts are exhaustively described in the District Court's opinion and may be briefly restated here. In 1981, the Republican Party controlled both houses of the Indiana General Assembly, and its candidate held the Governor's seat. Pursuant to the requirements of the State Constitution, the General Assembly undertook legislative redistricting based on 1980 census data. A Conference Committee, all of whose members were Republicans, was assigned the task of drawing district maps with the assistance of a private computer firm. The information fed into the computer primarily concerned the political complexion of the State's precincts. The redistricting process was conducted in secret. Democratic legislators were not afforded *any* participation in designing the district maps that were adopted. There were no hearings where members of the public were invited to express

their views. The Republican Committee revealed its proposed redistricting plan two days before the end of the legislative session, and the Democrats hurriedly presented an alternative plan. On the last day of the session, the Republican plan was adopted by party line vote in both Houses of the General Assembly. The Governor signed the plan into law.

In 1982 and 1984, elections were held under the new redistricting plan. Prior to the 1982 election, this lawsuit was commenced by appellees, a group of Indiana Democrats who claimed that the plan constitutes a partisan political gerrymander designed to disenfranchise Democratic voters in violation of the Equal Protection Clause of the Fourteenth Amendment.[2] Since trial was completed after the 1982 election, appellees relied in part on the disparity between votes cast for Democratic legislative candidates in that election and seats captured by Democrats. The case was heard by a three-judge panel in the District Court for the Southern District of Indiana. The District Court, over the dissent of Judge Pell, made extensive findings of fact and determined that appellees had established an unconstitutional partisan gerrymander. 603 F. Supp. 1479 (SD Ind. 1984). The

---

[2] In the District Court, appellees' lawsuit was consolidated with a suit brought by the Indiana NAACP. The plaintiffs in the NAACP suit argued that the redistricting intentionally fragmented concentrations of black voters in violation of the Fourteenth and Fifteenth Amendments, and of § 2 of the Voting Rights Act of 1965, 42 U. S. C. § 1973. The District Court determined that the plan discriminated against black voters, not because of their race, but because blacks had a demonstrated and overwhelming tendency to vote as a bloc for Democratic candidates. Indeed, the District Court explicitly found that the "disadvantaging effect of the plan's multi-member districts falls particularly hard and harsh upon black voters in the state." 603 F. Supp. 1479, 1488 (SD Ind. 1984). Rather than taking a cross-appeal challenging the District Court's rejection of their constitutional and statutory claims, the NAACP plaintiffs have filed a brief in this Court urging affirmance of the District Court's judgment that the plan unconstitutionally discriminates against Democratic voters as a group and against blacks as members of that group.

Court today reverses the District Court, without concluding that any of its findings was clearly erroneous.

## II

### A

Gerrymandering is "the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes." *Kirkpatrick* v. *Preisler*, 394 U. S. 526, 538 (1969) (Fortas, J., concurring).[3] As JUSTICE STEVENS correctly observed, gerrymandering violates the Equal Protection Clause only when the redistricting plan serves "no purpose other than to favor one segment—whether racial, ethnic, religious, economic, or political—that may occupy a position of strength at a particular time, or to disadvantage a politically weak segment of the community." *Karcher* v. *Daggett*, 462 U. S. 725, 748 (1983) (concurring opinion).

The term "gerrymandering," however, is also used loosely to describe the common practice of the party in power to choose the redistricting plan that gives it an advantage at the polls. An intent to discriminate in this sense may be present whenever redistricting occurs. See *Gaffney* v. *Cummings*, 412 U. S. 735, 753 (1973); *Cousins* v. *City Council of Chicago*, 466 F. 2d 830, 847 (CA7) (Stevens, J., dissenting), cert. denied, 409 U. S. 893 (1972). Moreover, since legislative

---

[3] Webster's Third New International Dictionary (unabridged ed. 1961) defines "gerrymander" as "to divide (a territorial unit) into election districts in an unnatural and unfair way with the purpose of giving one political party an electoral majority in a large number of districts while concentrating the voting strength of the opposition in as few districts as possible." The term "gerrymander" was coined by combining the last name of Elbridge Gerry with the word "salamander" in order to describe the "fancied resemblance to a salamander . . . of the irregularly shaped outline of an election district in northeastern Massachusetts that had been formed for partisan purposes in 1812 during Gerry's governorship" of that State. *Ibid.* Though many of the voting districts appearing in the plans challenged here have bizarre shapes, House District 66 perhaps most closely resembles a salamander. See the redistricting maps appended to this opinion. These maps were reproduced from trial exhibits provided by the parties.

bodies rarely reflect accurately the popular voting strength of the principal political parties, the effect of any particular redistricting may be perceived as unfair. See 412 U. S., at 752–754. Consequently, only a sensitive and searching inquiry can distinguish gerrymandering in the "loose" sense from gerrymandering that amounts to unconstitutional discrimination. Because it is difficult to develop and apply standards that will identify the unconstitutional gerrymander, courts may seek to avoid their responsibility to enforce the Equal Protection Clause by finding that a claim of gerrymandering is nonjusticiable. I agree with the Court that such a course is mistaken, and that the allegations in this case raise a justiciable issue.[4]

Moreover, I am convinced that appropriate judicial standards can and should be developed. Justice Fortas' definition of unconstitutional gerrymandering properly focuses on whether the boundaries of the voting districts have been distorted deliberately and arbitrarily to achieve illegitimate ends. *Kirkpatrick* v. *Preisler, supra*, at 538. Under this definition, the merits of a gerrymandering claim must be determined by reference to the configurations of the districts, the observance of political subdivision lines, and other criteria that have independent relevance to the fairness of redistricting. See *Karcher* v. *Daggett, supra*, at 755–759 (STEVENS, J., concurring). In this case, the District Court examined the redistricting in light of such factors and found, among other facts, that the boundaries of a number of districts were deliberately distorted to deprive Democratic voters of an equal opportunity to participate in the State's legislative processes. The plurality makes no reference to any of these findings of fact. It rejects the District Court's

---

[4] As the Court properly explains, our prior decisions make clear that an equal protection challenge to redistricting does not present a nonjusticiable political question. See *Baker* v. *Carr*, 369 U. S. 186 (1962); *Reynolds* v. *Sims*, 377 U. S. 533 (1964); *Gaffney* v. *Cummings*, 412 U. S. 735 (1973). Accordingly, I join Part II of JUSTICE WHITE's opinion.

ultimate conclusion with no explanation of the respects in which appellees' proof fell short of establishing discriminatory effect. A brief review of the Court's jurisprudence in the context of another kind of challenge to redistricting, a claim of malapportionment, demonstrates the pressing need for the Court to enunciate standards to guide legislators who redistrict and judges who determine the constitutionality of the legislative effort.

### B

The Equal Protection Clause guarantees citizens that their State will govern them impartially. See *Karcher* v. *Daggett, supra,* at 748 (STEVENS, J., concurring). In the context of redistricting, that guarantee is of critical importance because the franchise provides most citizens their only voice in the legislative process. *Reynolds* v. *Sims,* 377 U. S., at 561–562, 565–566. Since the contours of a voting district powerfully may affect citizens' ability to exercise influence through their vote, district lines should be determined in accordance with neutral and legitimate criteria. When deciding where those lines will fall, the State should treat its voters as standing in the same position, regardless of their political beliefs or party affiliation. *Chapman* v. *Meier,* 420 U. S. 1, 17 (1975); *Gaffney* v. *Cummings, supra,* at 751.

The first cases in which this Court entertained equal protection challenges to redistricting involved allegations that state legislatures had refused to redesign States' voting districts to eliminate gross population disparities among those districts. *E. g., Baker* v. *Carr,* 369 U. S. 186 (1962); *Reynolds* v. *Sims, supra.* The Court's decision in *Reynolds* v. *Sims* illustrates two concepts that are vitally important in evaluating an equal protection challenge to redistricting. First, the Court recognized that equal protection encompasses a guarantee of equal *representation,* requiring a State to seek to achieve through redistricting "fair and effective representation for all citizens." *Reynolds* v. *Sims, supra,* at

565–566; see *Gaffney* v. *Cummings*, 412 U. S., at 748. The concept of "representation" necessarily applies to groups: groups of voters elect representatives, individual voters do not. Gross population disparities violate the mandate of equal representation by denying voters residing in heavily populated districts, *as a group*, the opportunity to elect the number of representatives to which their voting strength otherwise would entitle them. While population disparities do dilute the weight of individual votes, their discriminatory effect is felt only when those individual votes are combined. Thus, the fact that individual voters in heavily populated districts are free to cast their ballot has no bearing on a claim of malapportionment.

Second, at the same time that it announced the principle of "one person, one vote" to compel States to eliminate gross disparities among district populations, the Court plainly recognized that redistricting should be based on a number of neutral criteria, of which districts of equal population was only one. *Reynolds* v. *Sims* identified several of the factors that should guide a legislature engaged in redistricting. For example, the Court observed that districts should be compact and cover contiguous territory, precisely because the alternative, "[i]ndiscriminate districting," would be "an open invitation to partisan gerrymandering." 377 U. S., at 578–579. Similarly, a State properly could choose to give "independent representation" to established political subdivisions. Adherence to community boundaries, the Court reasoned, would both "deter the possibilities of gerrymandering," and allow communities to have a voice in the legislature that directly controls their local interests. *Id.*, at 580–581. See also *Mahan* v. *Howell*, 410 U. S. 315, 325–326 (1973). Thus, *Reynolds* v. *Sims* contemplated that "one person, one vote" would be only one among several neutral factors that serve the constitutional mandate of fair and effective representa-

tion. See *Gaffney* v. *Cummings, supra,* at 748–749. It was not itself to be the only goal of redistricting.[5]

A standard that judges the constitutionality of a districting plan solely by reference to the doctrine of "one person, one vote" may cause two detrimental results.[6] First, as a perceived way to avoid litigation, legislative bodies may place undue emphasis on mathematical exactitude, subordinating or ignoring entirely other criteria that bear directly on the fairness of redistricting. See *Karcher* v. *Daggett,* 462 U. S., at 753 (STEVENS, J., concurring); *id.,* at 774 (WHITE, J., dissenting); *Gaffney* v. *Cummings, supra,* at 749. Second, as this case illustrates, and as *Reynolds* v. *Sims* anticipated, exclusive or primary reliance on "one person, one vote" can betray the constitutional promise of fair and effective representation by enabling a legislature to engage intentionally in clearly discriminatory gerrymandering. See *Wells* v. *Rockefeller,* 394 U. S. 542, 551 (1969) (Harlan, J., dissenting).

---

[5] The doctrine of "one person, one vote" originally was regarded as a means to prevent discriminatory gerrymandering since "opportunities for gerrymandering are greatest when there is freedom to construct unequally populated districts." *Kirkpatrick* v. *Preisler,* 394 U. S. 526, 534, n. 4 (1969). Advances in computer technology achieved since the doctrine was announced have drastically reduced its deterrent value by permitting political cartographers to draw districts of equal population that intentionally discriminate against cognizable groups of voters. See *Karcher* v. *Daggett,* 462 U. S. 725, 752, n. 10 (1983) (STEVENS, J., concurring). For "one person, one vote" to serve its intended purpose of implementing the constitutional mandate of fair and effective representation, therefore, consideration also must be given to other neutral factors.

[6] In decisions concerning congressional redistricting, the Court has focused its attention almost exclusively on whether a challenged plan satisfies "one person, one vote." See *Karcher* v. *Daggett, supra; White* v. *Weiser,* 412 U. S. 783 (1973); *Kirkpatrick* v. *Preisler, supra.* In cases involving state legislative redistricting, such as the case before us today, the Court has refused to limit a legislature to the single goal of precise population equality. *Gaffney* v. *Cummings,* 412 U. S., at 745; *Mahan* v. *Howell,* 410 U. S. 315, 322–325 (1973).

## C

In light of the foregoing principles, I believe that the plurality's opinion is seriously flawed in several respects. First, apparently to avoid the forceful evidence that some district lines indisputably were designed to and did discriminate against Democrats, the plurality describes appellees' claim as alleging that "Democratic voters over the State as a whole, not Democratic voters in particular districts, have been subjected to unconstitutional discrimination." *Ante*, at 127. This characterization is not inconsistent with appellees' proof, and the District Court's finding, of statewide discriminatory effect resulting from "individual districting" that "exemplif[ies] this discrimination." *Ibid.* If Democratic voters in a number of critical districts are the focus of unconstitutional discrimination, as the District Court found, the *effect* of that discrimination will be felt over the State as a whole.

The plurality also erroneously characterizes the harm members of the losing party suffer as a group when they are deprived, through deliberate and arbitrary distortion of district boundaries, of the opportunity to elect representatives of their choosing.[7] It may be, as the plurality suggests, that

[7] The plurality correctly concludes that a redistricting plan is not unconstitutional merely because the plan makes it more difficult for a group of voters to elect the candidate of its choice or merely because the plan does not provide proportional representation. *Ante*, at 132. While the "Equal Protection Clause confers a substantive right to participate in elections on an equal basis with other qualified voters," *Mobile* v. *Bolden*, 446 U. S. 55, 77 (1980) (plurality opinion), the Constitution does not guarantee proportional representation or protect any group from defeat at the polls, *id.*, at 77–80; see *White* v. *Regester*, 412 U. S. 755, 765–766 (1973). But the plurality leaps from that conclusion to the assumption that "[a]n individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district." *Ante*, at 132. Thus, the plurality apparently believes that effects on election results are of little import, as long as the losers have some access to their representatives. Though effects on election results do not suffice to establish an unconstitutional gerrymander, they certainly are

representatives will not "entirely ignore the interests" of opposition voters. *Ante*, at 132. But it defies political reality to suppose that members of a losing party have as much political influence over state government as do members of the victorious party. Even the most conscientious state legislators do not disregard opportunities to reward persons or groups who were active supporters in their election campaigns. Similarly, no one doubts that partisan considerations play a major role in the passage of legislation and the appointment of state officers. Not surprisingly, therefore, the District Court expressly found that "[c]ontrol of the General Assembly is crucial" to members of the major political parties in Indiana. 603 F. Supp., at 1483.[8] In light of those findings, I cannot accept the plurality's apparent conclusion that loss of this "crucial" position is constitutionally insignificant as long as the losers are not "entirely ignored" by the winners.

The plurality relies almost exclusively on the "one person, one vote" standard to reject appellees' convincing proof that the redistricting plan had a seriously discriminatory effect on their voting strength in particular districts. The plurality properly describes the claim in this case as a denial of fair and effective "representation," *ante*, at 124, but it does not provide any explanation of how complying with "one person, one

---

relevant to such a claim, and they may suffice to show that the claimants have been injured by the redistricting they challenge.

[8] The District Court found: "Control of the General Assembly is crucial to a political party for a number of reasons. The majority party elects the Speaker of the House, a person who wields considerable power in the assigning of bills to committees, the conduct of the actual legislative sessions, and is empowered, under legislative rules, to prevent bills from reaching the floor for debate or vote. Similarly, the majority party elects floor leaders in both houses who control the flow of legislation, the assignment of members to committees, and the appointment of committee chairmen. All of these powers are important to the achievement of a party's legislative goals. There is little doubt that the minority party plays a less substantial role in the drafting and enactment of legislation." 603 F. Supp., at 1483.

vote" deters or identifies a gerrymander that unconstitutionally discriminates against a cognizable group of voters. While that standard affords some protection to the voting rights of individuals, "it protects groups only indirectly at best," *Karcher* v. *Daggett*, 462 U. S., at 752 (STEVENS, J., concurring), even when the group's identity is determined solely by reference to the fact that its members reside in a particular voting district. "One person, one vote" alone does not protect the voting rights of a group made up of persons affiliated with a particular political party who seek to achieve representation through their combined voting strength. Thus, the facts that the legislature permitted each Democratic voter to cast his or her one vote, erected no direct barriers to Democratic voters' exercise of the franchise, and drew districts of equal population, are irrelevant to a claim that district lines were drawn for the purpose and with the effect of substantially debasing the strength of votes cast by Democrats as a group.[9]

The final and most basic flaw in the plurality's opinion is its failure to enunciate any standard that affords guidance to legislatures and courts.[10] Legislators and judges are left to

---

[9] As was said in the context of a constitutional challenge by black voters to an at-large voting scheme, "[t]he absence of official obstacles to registration, voting, and running for office heretofore has never been deemed to insulate an electoral system" from constitutional attack. *Mobile* v. *Bolden, supra,* at 102 (WHITE, J., dissenting).

[10] The plurality describes its standard as requiring a "threshold" showing that the "electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence in the political process as a whole." *Ante,* at 132; see *ante,* at 134, n. 14. Plaintiffs apparently can meet the plurality's "threshold" only after a number of elections have been held under the challenged plan. *Ante,* at 135–136. At one point, the plurality acknowledges that this formulation is "somewhat different" from any standard we have previously used to test an electoral plan against an equal protection challenge, *ante,* at 132, and also takes pains to say that its opinion here does not suggest any "alteration of the standards developed" for evaluating racial challenges, *ante,* at 132, n. 13; see *ante,* at 134, n. 14. Curiously, the plurality then goes on to claim that its standard is consistent

wonder whether compliance with "one person, one vote" completely insulates a partisan gerrymander from constitutional scrutiny, or whether a fairer but as yet undefined standard applies. The failure to articulate clear doctrine in this area

with that used when a racial group challenges an electoral scheme, *ante*, at 139–140, and with our "equal protection cases generally," *ante*, at 141. This claim is simply incorrect.

Our cases have construed the Equal Protection Clause to require proof of intentional discrimination, placing the burden on plaintiffs to trace the "'invidious quality of a law claimed to be racially discriminatory . . . to a racially discriminatory purpose.'" *Rogers* v. *Lodge*, 458 U. S. 613, 616 (1982), quoting *Washington* v. *Davis*, 426 U. S. 229, 240 (1976). In none of those cases was the Court willing to assume discriminatory intent, as the plurality suggests today is the proper course. *Ante*, at 141. While the plurality correctly observes that our prior decisions have held that disproportionate election results alone do not violate the Constitution, it erroneously suggests that those holdings flowed solely from the "perception that the power to influence the political process is not limited to winning elections." *Ante*, at 131–132. The plurality wholly ignores the basic problem underlying all of those prior decisions, namely, that the plaintiffs came into court with no direct proof of discriminatory intent. In those cases, the Court concluded that proof of discriminatory effect, including disproportionate election results, if serious enough, could give rise to an inference of purposeful discrimination. See *Rogers* v. *Lodge*, *supra*, at 618. As JUSTICE WHITE has explained, the Court's decisions in both *White* v. *Regester*, 412 U. S. 755 (1973), and *Whitcomb* v. *Chavis*, 403 U. S. 124 (1971), rested on the proposition that the requisite "invidious discriminatory purpose" can be inferred from proof of "objective factors" concerning discriminatory effect. *Mobile* v. *Bolden*, 446 U. S., at 95; see *id.*, at 94–97, 102–103 (dissenting opinion); see also *White* v. *Regester*, *supra*, at 765 (multimember districts are unconstitutional where "used *invidiously* to cancel out" racial groups' voting strength). I cannot agree, as the plurality suggests, that a standard requiring proof of "heightened effect," where invidious intent has been established directly, has support in any of our cases, or that an equal protection violation can be established "only where a history (actual or projected) of disproportionate results appears." *Ante*, at 139. If a racial minority established that the legislature adopted a redistricting law for no purpose other than to disadvantage that group, the plurality's new and erroneous standard would require plaintiffs to wait for the results of several elections, creating a history of discriminatory effect, before they can challenge the law in court. *Ante*, at 135–136.

places the plurality in the curious position of inviting further litigation even as it appears to signal the "constitutional green light"[11] to would-be gerrymanderers.

## III

In *Karcher* v. *Daggett*, JUSTICE STEVENS, echoing the decision in *Reynolds* v. *Sims*, described factors that I believe properly should guide both legislators who redistrict and judges who test redistricting plans against constitutional challenges. 462 U. S., at 753–761. The most important of these factors are the shapes of voting districts and adherence to established political subdivision boundaries.[12] Other relevant considerations include the nature of the legislative procedures by which the apportionment law was adopted and legislative history reflecting contemporaneous legislative goals. To make out a case of unconstitutional partisan gerrymandering, the plaintiff should be required to offer proof concerning these factors, which bear directly on the fairness of a redistricting plan, as well as evidence concerning population disparities and statistics tending to show vote dilution. No one factor should be dispositive.[13]

---

[11] Edwards, The Gerrymander and "One Man, One Vote," 46 N. Y. U. L. Rev. 879, 880 (1971).

[12] In some cases, proof of grotesque district shapes may, without more, provide convincing proof of unconstitutional gerrymandering. In addition to the maps appended to this opinion, see the redistricting maps appended to the Court's opinions in *Gomillion* v. *Lightfoot*, 364 U. S. 339, 348 (1960), and in *Karcher* v. *Daggett*, 462 U. S., at 744.

[13] Groups may consistently fail to elect representatives under a perfectly neutral election scheme. Thus, a test that turns only on election results, as the plurality's standard apparently does, likely would identify an unconstitutional gerrymander where none existed. The test that I would adopt requires consideration of all the circumstances surrounding the plan, including factors initially identified in *Reynolds* v. *Sims*, to determine if a constitutional violation has occurred. Since democracy can work well and fairly only when citizens have an opportunity to become familiar with their voting districts, where they must focus their political activities, district boundaries must have some rationality. Confusion inevitably follows, as clearly will be the case in Indiana, when a citizen finds himself or herself

In this case, appellees offered convincing proof of the ease with which mapmakers, consistent with the "one person, one vote" standard, may design a districting plan that purposefully discriminates against political opponents as well as racial minorities. Computer technology now enables gerrymanderers to achieve their purpose while adhering perfectly to the requirement that districts be of equal population. Relying on the factors correctly described by JUSTICE STEVENS in *Karcher* v. *Daggett*, the District Court carefully reviewed appellees' evidence and found that the redistricting law was intended to and did unconstitutionally discriminate against Democrats as a group. We have held that a district court's ultimate determination that a redistricting plan was "being maintained for discriminatory purposes," as well as its "subsidiary findings of fact," may not be set aside by a reviewing court unless they are clearly erroneous. *Rogers* v. *Lodge*, 458 U. S. 613, 622–623 (1982); see, *e. g.*, *White* v. *Regester*, 412 U. S. 755, 769–770 (1973). The plurality ignores these precedents.[14] The plurality also disregards the various factors discussed by the District Court as adequate indicia of unconstitutional gerrymandering.

---

forced to associate with several artificial communities, depending on which office is on the ballot. Thus, irrational lines themselves affect the ability of all voters to exercise their political influence, with disproportionate election results illustrating the effect of a plan that was deliberately designed to serve no purpose other than to minimize the voting strength of a disfavored group.

[14] The plurality ignores the "clearly erroneous" standard of Rule 52(a), by saying that it has not rejected any of the District Court's findings of fact, but has "merely . . . disregarded those that were irrelevant in this case and held insufficient those that inadequately supported the District Court's ultimate legal conclusions." *Ante*, at 142, n. 20. In a gerrymandering case the *facts* as to how, where, and why the legislature drew the district boundaries are at the heart of the equal protection violation. Beyond stating that appellees' statistical proof failed to satisfy its proposed threshold, the plurality makes no effort to explain its flat assertions that the District Court's careful findings were "irrelevant" or "insufficient."

### A

A court should look first to the legislative process by which the challenged plan was adopted.   Here, the District Court found that the procedures used in redistricting Indiana were carefully designed to exclude Democrats from participating in the legislative process.   In February 1981, both Houses of the General Assembly passed reapportionment bills with no substantive content and referred them to the other chamber where conflicting amendments were made.   The purpose of this process was to send "vehicle bills" to a Conference Committee whose task was to apportion representation.   Four conferees and four advisers served on the Committee.   The conferees, all Republicans, were responsible for designing the voting districts and were entitled to vote on the result of their own efforts.   The advisers, Democrats, were excluded from the mapmaking process and were given no Committee vote.   603 F. Supp., at 1483.

The legislative process consisted of nothing more than the majority party's private application of computer technology to mapmaking.   The Republican State Committee engaged the services of a computer firm to aid the conferees in their task.   Id., at 1483–1484.   According to the Conference Committee Chairman, the only data used in the computer program were precinct population, race of precinct citizens, precinct political complexion, and statewide party voting trends. Access to the mapmaking process was strictly limited.   No member of the Democratic Party and no member of the public was provided with any of the information used in or generated by the computer program.   When questioned about the lack of minority party participation in the redistricting process, the Chairman of the Conference Committee stated that the Democrats would "have the privilege to offer a minority map.   But I will advise you in advance that it will not be accepted."   Id., at 1484.

Republicans promised to hold public hearings on redistricting. No hearing was held during the mapmaking process, the only time during which voters' views could be expected to influence their legislators. *Ibid.* Two days before the end of the General Assembly's regular session, during the first and only public hearing on reapportionment, the Conference Committee revealed for the first time the result of its mapmaking effort. This timing gave the Democrats but 40 hours in which to review the districting of more than 4,000 precincts. *Ibid.* On the last day of the session, April 30, 1981, the Conference Committee report was introduced for a vote and was adopted by party line vote in both Houses of the General Assembly.[15] *Ibid.*

B

Next, the District Court found that the maps "conspicuously ignore[d] traditional political subdivisions, with no concern for any adherence to principles of community interest." *Id.*, at 1493. The court carefully described how the mapmakers carved up counties, cities, and even townships in their effort to draw lines beneficial to the majority party. Many districts meander through several counties, picking up a number of townships from each.[16] The District Court explained why this failure to honor county boundaries could be expected to have a detrimental impact on citizens' exercise of their vote. In Indiana, the county government is the seat of local affairs. *Id.*, at 1494. The redistricting dissects counties into strange shapes lacking in common interests, on one occasion even placing the seat of one county in a voting dis-

---

[15] Presumably as a result of the haste with which the redistricting law was pushed through the General Assembly, parts of the State were "wholly omitted in the 1981 legislation." 603 F. Supp., at 1484. In the 1982 legislative session, therefore, amendments were passed to assign the omitted areas to voting districts. *Ibid.*

[16] *E. g.*, House Districts 20, 22, 25, 28, 42, 45, 46, 55, 57, 62, 66, 70, 73, 74; Senate Districts 7, 24, 37, 39, 45, 47. See the redistricting maps appended to this opinion.

trict composed of townships from other counties. *Id.*, at 1487; see House Districts 45, 46, *infra.* Under these conditions, the District Court expressly found that "the potential for voter disillusion and nonparticipation is great," as voters are forced to focus their political activities in artificial electoral units. 603 F. Supp., at 1494. Intelligent voters, regardless of party affiliation, resent this sort of political manipulation of the electorate for no public purpose.

Deposition testimony of the Chairman of the Conference Committee revealed that the mapmakers gave no consideration to the interests of communities. In the Chairman's view, the concept of honoring community interests meant only that mapmakers should refuse to divide a small, suburban community. The shapes of the voting districts and the manner in which the districts divide established communities, from the county to the township level, illustrate that community interests were ignored by appellants. As the District Court observed, for example, "it is difficult to conceive the interests shared by blacks in Washington Township and white suburbanites in Hamilton and Boone Counties, or the shared interest of Allen and Noble County farmers with residents of downtown Fort Wayne." *Id.*, at 1487.

C

In addition to the foregoing findings that apply to both the House and Senate plans, the District Court also noted the substantial evidence that appellants were motivated solely by partisan considerations. *Id.*, at 1484. There is no evidence that the public interest in a fair electoral process was given any consideration by appellants. Indeed, as noted above, the mapmakers' partisan goals were made explicitly clear by contemporaneous statements of Republican leaders who openly acknowledged that their goal was to disadvantage Democratic voters. As one Republican House member concisely put it, "[t]he name of the game is to keep

us in power."[17]   NAACP Plaintiffs' Exhibit 232 (Indianapolis Star, Mar. 22, 1981, section 2, p. 3).   When the plan was completed, Republican leaders announced that the House map was designed to yield 56 "safe" Republican seats and 30 Democratic seats, with the remainder being "tossups." NAACP Plaintiffs' Exhibit 242 (Post-Tribune, Gary, Ind., Apr. 29, 1981, p. 1).   Republicans expected that their Senate map would regularly produce 30 Republican seats and 8 to 10 Democratic seats so that Republicans would maintain their grip on the Senate even if Democrats won the remaining seats.   NAACP Plaintiffs' Exhibit 241 (Post-Tribune, Gary, Ind., Apr. 29, 1981, p. 1).   In short, the record unequivocally demonstrates that in 1981 the Republican-dominated General Assembly deliberately sought to design a redistricting plan under which members of the Democratic Party would be deprived of a fair opportunity to win control of the General Assembly at least until 1991, the date of the next redistricting.

IV

A

I turn now to the District Court's findings with respect particularly to the gerrymandering of the House districts. The court found that the plan contained voting districts whose irrational shapes called for justification.   *E. g.*, House Districts 20, 22, 25, 45, 46, 48, 62, 66, 70, 73.   The findings concerning the district configurations reflect the panel's familiarity with Indiana geography and the particular characteristics of the State's political subdivisions.   As the District Court noted, the voter confusion generated by irrational dis-

---

[17] Evidence of partisan sparring during the redistricting process, of course, is not sufficient to establish an equal protection violation or to show that the legislature pursued no legitimate objectives in adopting the plan. But such evidence is probative of contemporaneous legislative goals, adding support to the objective facts showing that the legislature adopted the plan for the sole purpose of disadvantaging members of the political party that happened to be out of power.

trict boundaries is exacerbated in this case by the fact that the lines in the House plan were drawn independently of those in the Senate plan. 603 F. Supp., at 1484–1485. When the Senate voting districts are overlaid on the House districts, the potential for voter confusion becomes readily apparent as lines and districts intersect in a crazy quilt.[18]

The District Court carefully considered the multimember districts contained in the House plan and found that they were intentionally employed to minimize Democratic voting power. This Court has expressly recognized that "[a] districting plan may create multimember districts perfectly acceptable under equal population standards, but invidiously discriminatory because they are employed 'to minimize or cancel out the voting strength of racial or political elements of the voting population.'" *Gaffney* v. *Cummings*, 412 U. S., at 751 (quoting *Fortson* v. *Dorsey*, 379 U. S. 433, 439 (1965)).[19] In this case, invidious purpose may be inferred from the mapmakers' selection of areas to be divided into multimember districts. These districts appear in some areas where they had been used previously and not in others, in some urban areas and not in others, and in some areas where

_____

[18] Since the Indiana House of Representatives has 100 members, and the Senate has 50, the mapmakers readily could have designed a "nested" plan, that is, a plan that included "two House districts within one Senate district." 603 F. Supp., at 1484–1485. By permitting voters readily to identify their voting districts and corresponding representatives, a nested plan can be expected to foster voter participation. See Grofman, 33 UCLA L. Rev., at 88, 92. Instead, as the District Court observed, the mapmakers drew House districts that were "not at all relevant to the Senate districts." 603 F. Supp., at 1484.

[19] In the context of racial gerrymandering claims, the Court has refused to adopt a *per se* rule barring the use of multimember districts. *White* v. *Regester*, 412 U. S., at 765. But the Court has repeatedly recognized that the characteristics of multimember districts, namely, their tendency to submerge the voting strength of the minority by allowing the majority to capture all of the district's assigned seats, make them a ready means for legislative discrimination against racial groups or political opponents. *E. g.*, *Rogers* v. *Lodge*, 458 U. S., at 616.

their use required combining rural townships with urban areas from another county.[20]  The only discernible pattern is the appearance of these districts in areas where their winner-take-all aspects can best be employed to debase Democratic voting strength.  The District Court determined that the multimember districts diluted Democratic voting strength by "stacking" Democrats into districts "where their majority would be overwhelming" and by fragmenting populations of Democratic voters among other districts where their voting strength would be reduced.  603 F. Supp., at 1488–1489, 1494.  For example, the mapmakers split Fort Wayne, a city with a demonstrated tendency to vote for Democratic candidates, and associated each of the halves with areas from outlying counties whose residents had a pattern of voting for Republican candidates.  *Id.*, at 1488, 1494; see House Districts 19, 20.  Similarly, the redistricting of Marion County presents a clear example of dilution of Democrats' voting strength through the use of multimember districts. Though population figures entitled the county to elect exactly 14 House members, the mapmakers decided to tack on portions of two neighboring counties in order artificially to create a population base entitled to elect 15 representatives. Then, they carved that artificial geographical unit into five three-member districts whose irregular shapes were designed to fence Democrats into one heavily Democratic district and scatter pockets of Democratic strength among the other four districts.  *Id.*, at 1487, 1489; see House Districts 48, 49, 50, 51, 52.[21]

---

[20] The multimember districts are House Districts 7, 9, 10, 11, 12, 14, 15, 19, 20, 31, 48, 49, 50, 51, 52, 75.

[21] The District Court found that the multimember districts employed in Marion County were "particularly suspect with respect to compactness." 603 F. Supp., at 1487.  Of all the districts in the challenged plan, the court determined that House District 48 "presents the most grievous example of the political cartographer's handiwork in this case."  *Ibid.*  That district "forms the letter 'C' around the central city of Indianapolis" and "includes portions of the urban southwestside of the city, the airport and suburban

Appellees further demonstrated through a statistical showing that the House plan debased the effectiveness of their votes. In 1982, all 100 House seats were up for election.

---

area around Ben Davis High School on the west side, and the Meridian Hills area at the northern part of the county." *Ibid.* The court expressly determined that, even though House District 48 satisfies "one person, one vote," there was "simply no conceivable justification for this kind of district." *Ibid.*

The following map, taken from an exhibit provided by the parties, shows this grotesque gerrymandering. The legislature first proceeded to disregard Marion County's boundary lines, which essentially form a square, and then carved the area it created into oddly shaped multimember districts.

The District Court also noted the discriminatory purpose served by the Marion County House Districts, including District 48: "[T]he powerful Marion County delegation forced neighboring counties to cede turf to permit a preservation of the multi-member districts which had consistently returned Republicans to the Statehouse." *Id.*, at 1487, n. 1. Moreover, as appellees' statistical showing of vote dilution plainly demonstrates, these gerrymandered districts had a discriminatory impact on the votes of Democrats as a group.

Democratic candidates received about 51.9 percent of the vote, and Republican candidates received about 48.1 percent. Forty-three Democratic representatives were elected; 57 Republicans were elected.[22] Appellees offered startling statistics with respect to House results in Marion and Allen Counties, two areas in which multimember districts were used. In these counties, Democratic candidates earned 46.3 percent of the vote, but won only 3 of 21 House seats. As the District Court observed, "such a disparity speaks for itself." *Id.*, at 1489.[23]

B

Since half of the Senate membership is up for election every two years, the only election results under the challenged plan available at trial related to 25 of the 50 Senate seats. Those results showed that, of the seats up for election in 1982, Democrats were elected to 13 seats and Republicans to 12. Democratic candidates earned about 53.1 percent of the vote, and Republicans received about 46.9 percent. At trial, it was appellees' contention that most of the Senate seats won by Democrats in 1982 were "safe" Democratic seats so that their party's success at the polls in that year was fully consistent with the statewide Republican gerrymander. This contention is borne out by the results of the 1984 Senate election. In that election, Democratic candidates received 42.3 percent of the vote, and Republicans 57.7

---

[22] In the 1984 election, Democratic candidates earned approximately 44 percent of the vote, and Republicans earned approximately 56 percent. Thirty-nine Democrats were elected to the House, and 61 Republicans were elected. The figures for the 1984 elections cited in this opinion were provided by the Elections Research Center, Washington, D. C. A supplemental statement filed by appellants in the District Court following trial also quoted some of the 1984 election results, including the fact that in 1984 the Democratic candidate for Governor won 48 percent of the vote.

[23] The 1984 House election in the Marion and Allen County House districts reflected a similar disparity, when Republicans again captured 18 of the 21 House seats and the Democrats 3 despite the fact that Democratic candidates earned approximately 38 percent of the vote in these counties.

percent.    Yet, of the 25 Senate positions up for election, only 7 were captured by Democrats.[24]

[24] The District Court's discussion of district shapes focused primarily on the House plan.    As the following map of the Senate districts in the Marion County area illustrates, the Senate plan also contains districts with unusual shapes.    Although the population of Marion County, whose boundary lines form a square, was entitled to elect exactly seven Senators, 603 F. Supp., at 1487, n. 1, the mapmakers ignored both that population figure and the county boundaries, and created eight wholly irrational voting districts.    As one Democratic voter remarked when the Senate plan was unveiled: "People who live near the [district line separating Senate districts 33 and 34] are going to need an Indian guide and a compass to figure out which district they're in."    NAACP Plaintiffs' Exhibit 252 (Indianapolis Star, May 10, 1981, section 2, p. 3).

## C

The District Court found, and I agree, that appellants failed to justify the discriminatory impact of the plan by showing that the plan had a rational basis in permissible neutral criteria. Appellants' primary justification was that the plan comports with the principle of "one person, one vote." Their plan did adhere to that objective, with population deviations between House districts of 1.05 percent and between Senate districts of 1.15 percent. But reliance on "one person, one vote" does not sufficiently explain or justify the discrimination the plan inflicted on Democratic voters as a group. The District Court expressly found that the irregular district shapes could not be justified on the basis of population distribution. *Id.*, at 1494. Nor does adherence to "one person, one vote" excuse the mapmakers' failure to honor established political or community boundaries. It does not excuse the irrational use of multimember districts, with their devastating impact on the voting strength of Democrats. The only other justification offered by appellants, for which the District Court found some support as a contemporaneous goal, was that the mapmakers sought to maintain "the black representation in the General Assembly that existed prior to the new districting plan." But the court further determined that the impact of the redistricting fell most harshly on black voters who predominantly are Democrats. *Id.*, at 1488, 1489–1490. None of these critical findings was found by the plurality today to be clearly erroneous.

## V

In conclusion, I want to make clear the limits of the standard that I believe the Equal Protection Clause imposes on legislators engaged in redistricting. Traditionally, the determination of electoral districts within a State has been a matter left to the legislative branch of the state government. Apart from the doctrine of separation of powers and the federal system prescribed by the Constitution, federal

judges are ill equipped generally to review legislative decisions respecting redistricting. As the Court's opinion makes clear, however, our precedents hold that a colorable claim of discriminatory gerrymandering presents a justiciable controversy under the Equal Protection Clause. Federal courts in exercising their duty to adjudicate such claims should impose a heavy burden of proof on those who allege that a redistricting plan violates the Constitution. In light of *Baker* v. *Carr*, *Reynolds* v. *Sims*, and their progeny, including such comparatively recent decisions as *Gaffney* v. *Cummings*, this case presents a paradigm example of unconstitutional discrimination against the members of a political party that happened to be out of power. The well-grounded findings of the District Court to this effect have not been, and I believe cannot be, held clearly erroneous.

Accordingly, I would affirm the judgment of the District Court.[25]

[Maps of the Indiana House and Senate Districts follow this page.]

---

[25] As is evident from the several opinions filed today, there is no "Court" for a standard that properly should be applied in determining whether a challenged redistricting plan is an unconstitutional partisan political gerrymander. The standard proposed by the plurality is explicitly rejected by two Justices, and three Justices also have expressed the view that the plurality's standard will "prove unmanageable and arbitrary." *Ante*, at 155 (O'CONNOR, J., joined by BURGER, C. J., and REHNQUIST, J., concurring in judgment).

# INDIANA
# SENATE
# DISTRICTS

# INDIANA HOUSE DISTRICTS